UNITED STATES DISTRICT COURT
OF NEW JERSEY

---------------------------------------------------------------x

NICHOLAS E. PURPURA,

08-2974 (FLW)

Civil Docket No. _____

Plaintiff
*Pro se*

-against-

RICO/BREACH OF
FIDUCIARY DUTY/
NEGILENCE/ FRAUD

BUSHKIN, GAIMS, GAINS, JONAS & STREAM,
MONASCH & STRAUSS, MONASH, MOSS, & STRAUSS
JEFFREY T. STRAUSS, WACHTEL & GOLD, WACHTEL
& MASYR, LLP, BARBARA MAIDA, LESTER SACKS,
RACHEL A. ADAMS, JANE & JOHN DOE.
et, al

RECEIVED

JUN 1 7 2008

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

Defendants

TRIAL BY JURY
DEMANDED

---------------------------------------------------------------x

## JURISDICTION & VENUE

1.    The subject-matter jurisdiction of the Court over this action is based upon Sec. 1964 of RICO, 18 U.S.C. 1961(3). 18 U.S.C. 1964. 28 U.S.C. 1331, 1332 and principles of pendent jurisdiction.

2.    This Court has personal jurisdiction over each of the defendants pursuant to *inter alia, Sec. of RICO, U.S.C. 1961-1965.*

3.    Venue over this action is proper in the District pursuant to, *inter alia*, Sec. 1965 of RICO because the nominal defendants, and each of the defendants reside, are found, have an agent and/or transact their affairs in the District of New York. In accordance with Sec. 1965 (b) of RICO, the ends of justice require that all defendants be brought before this Court. Venue over this action is proper in this District pursuant to 28 U.S.C. Sec. 1391 (b) because all of the defendants reside in New York or the claims asserted herein arose in that District. Complainant invokes his rights under diversity of citizenship.

[1]

4.      The subject-matter jurisdiction of the Court over this action is pursuant to, *inter alia*, Title 42 U.S. Code s 1961-68 for violation of which extends the jurisdiction to cases arising under the U.S. Constitution.

5.      Complainant brings this action pursuant to *inter alia*, Title 28 U.S. Code 1331, in claims arising from violations of Federal Constitutional rights guaranteed in the Fifth & Fourteenth Amendments to the U.S. Constitution.

6.      This suit arises under the Racketeering Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. 1961-1968. The jurisdiction of this Court over Claims 1 through XVII, etc. is invoked pursuant to 18 U.S.C. 1964 and the general Federal question, statute, Section 1503 (relating to "*obstruction of justice*"), Section 1510 (relating to obstruction of criminal investigation) and/or section 501(c) (1) any offense involving fraud connected with case under title.

7.      This suit arises under common law and statutory rights and protection against misappropriation and theft of property. Claims I and XVI arise under the common law of breach of contract, by Defendants, Wachtel & Masyr, LLP, Jeffrey T. Strauss, Esq., Barbara Purpura, a/k/a Maida, et al., breach of fiduciary obligations by the State of New York. Claims I through XV are invoked by reason of diversity of citizenship, 28 U.S.C. s 1332, and under principles of pendent jurisdiction.

8.      The amount in controversy exceeds the sum of $10,000,000.00, exclusive of interest and costs under 18 U.S.C. s 1964(c)

9.      Venue is properly laid in this Court pursuant to 28 U.S.C. s 1391.

10.     As set forth in greater detail below, in connection with the acts, conduct, combination and "*enterprise*" alleged herein, the defendants and their co-conspirators, directly and indirectly, have used the United States mails and wire facilities. Many of these acts, as well as preparation and dissemination of materially false and misleading statements and omissions, occurred within the Southern District of New York.

[2]

## THE PARTIES

11.     Plaintiff, hereafter Complainant, Nicholas E. Purpura is an individual and existing under and by virtue of the laws of New Jersey (previously, an individual existing under and by virtue of the laws of New York) maintains his principal residence in 1802 Rue De La Port. Drive. Wall, New Jersey. 07719, and at all times material hereto;

12.     Defendant, Barbara Purpura, a/k/a Barbara Maida, hereafter Maida,) is a resident of the State of New York, residing at 5 Longfellow Avenue, Staten Island New York 10301

13.     Defendant, Jeffrey T. Strauss, Esq., (hereafter Strauss) individually, and formally doing business at 900 Third Avenue, New York, New York, 10022, is a resident of the State of New York, individually, and thereafter served as an Associate and Partner of the Law Firms named below. (Now located at Wachtel & Masyr, LLP., 110 East 59th Street, New York, New York 10022.)

(a)     Defendants, Wachtel & Masyr, LLP., 110 East 59th Street, New York, New York 10022, collectively referred to herein as defendants named herein were control persons of defendant Strauss. They had to ability to exercise control over the business and operations of Wachtel and Masyr with respect to the wrongful conduct alleged herein, among other things, and/or their involvement in the daily business of Wachtel & Masyr, and/or their positions on Wachtel and Masyr Board of Directors and/or their executive positions with Wachtel & Masyr, and/or their stock ownership. These defendants held their positions with Wachtel and Masyr and/or owned stock, or percentage points, directly or indirectly, and/or participated in the acts with respect to defendant Strauss and were able to, and did, in fact, exercise substantial control over the operations of Strauss with respect to the fraud issue herein including control over the scheme to extort profits and over the materially false and misleading statements, omissions, and course of conduct complained of herein.

(b)     Defendants Gold & Wachtel, 400 Garden City Plaza, Garden City, New York, 11530 collectively referred to herein as the defendants named herein, were control persons of defendant Strauss. They had ability to exercise control over the business and operations of Gold & Wachtel with respect to the wrongful conduct alleged herein, among other things, and/or their

[3]

involvement in the daily business of Gold & Wachtel, and/or their positions on Gold & Wachtel, Board of Directors, and/or their executive positions with Gold & Wachtel, and/or their stock ownership. These defendants held their positions with Wachtel and Masyr and/or owned stock, or percentage points, directly or indirectly, and/or participated in the acts with respect to defendant. They were able to, and did, in fact, exercise substantial control over the operations of Strauss with respect to the fraud herein issue, including control over the scheme to extort profits and over materially false and misleading statements, omissions and course of conduct complained of herein.

(c)     Defendants, Monasch, Moss & <u>Strauss</u>, 60 Cutter Mill Road, Suite 208, Great Neck, New York, 11021 and defendants Monasch & Strauss, 900 Third Avenue, New York, New York, 10022, collectively referred to herein as the defendants named herein, were control persons of defendant Strauss. They had ability to exercise control over the business and operations of Monasch, Moss, & Strauss with respect to the wrongful conduct alleged herein, among other things, and/or their involvement in the daily business of Monasch, Moss & Strauss, and/or their positions as partners and/or their executive positions with Monasch, Moss, & Strauss, and/or their stock ownership. These defendants held their positions with Monasch, Moss & Strauss and/or owned stock, or percentage points, directly or indirectly, and/or participated in the acts with respect to defendant. They were able to and did, in fact, exercise substantial control over the operations of Strauss with respect to the fraud herein issue, including control over the scheme to extort profits and over the materially false and misleading statements, omissions and course of conduct complained of herein.

(d)     Defendants, Bushkin, Gaims, Gains, Jonas & Stream, 777 Third Avenue, New York, New York, 10017 collectively referred to as the defendants named herein, were control persons of defendant Strauss. They had  the ability to exercise control over the business and operations of Bushkin, Gaims, Gains, Jonas & Stream with respect to the wrongful conduct alleged herein, among other things, and/or their involvement in the daily business of Bushkin, Gaims, Gains, Jonas & Stream, and/or their positions on Bushkin, Gaims, Gains, Jonas & Stream Board of Directors and/or their executive positions with Bushkin, Gaims, Gains, Jonas & Stream, and/or their stock ownership. These defendants held their positions with Bushkin, Gaims, Gains, Jonas & Stream and/or owned stock, or percentage points, directly or indirectly, and/or participated in

[4]

the acts with respect to defendant. They were able to and did, in fact, exercise substantial control over the operations of Strauss with respect to the fraud herein issue, including control over the scheme to extort profits and over the materially false and misleading statements, omissions and course of conduct complained of herein.

14. Defendant, Lester Sacks, is a resident of the State of New York, making his office c/o Richmond County Supreme Court, 355 Front Street, S.I. NY 10304.

15. Defendant, Rachel A. Adams, is a resident of the State of New York, making her office at Richmond County Supreme Court, 355 Front Street, S.I. NY 10304.

16. Each of the defendants identified in paragraphs 12, 13, (a) through (d) named above reside in, are found, have/had an agent, and/or transact their affairs in, the State of New York. Further, each of the wrongful acts alleged herein in substantial part took place in the State of New York. Each of their false and misleading statements alleged herein were formulated and disseminated in substantial part within the State of New York. The acts and transactions which form the basis for the state law claims asserted herein were committed in the State of New York and were intended to and did affect substantial interest of Plaintiff.

## CONCERTED ACTION AND DOE ALLEGATIONS

17. At all relevant times mentioned herein, the enterprise and each of its members has pursued a common course of conduct, acted in concert and conspired with, and aided and abetted one another to accomplish the wrongs complained of herein. Each defendant was the agent of each of the remaining defendants and was, at all times alleged herein, acting within the course and scope of the agency relationship. Each of the defendants is liable as a direct participant in, an enterprise co-actor and aider and abettor of, the wrongs alleged in this Complainant.

### Statement to the Court

Before addressing the subject of this case and the reason for bringing, the Plaintiff would first like to apologize to the Court for coming before the Court as a *pro se* litigant. The Plaintiff does not do so out of a desire to complicate the Court's work or because he has a "fool for a client." He does so out of sheer necessity, as the only reasonable means now available to him to protect

his civil rights and, simultaneously, hope to recover economic stability and attain justice. The length and complicated nature of this litigation has left Plaintiff on the verge of bankruptcy. This litigation's complicated and/or dangerous nature has dissuaded competent law firms from representing Plaintiff. Some attorneys whom he had hired in the past were threatened to drop him as a client. Scores of others told him they could not do so because doing so would threaten their livelihood, would mean their legal careers would be finished. In short, simple necessity is the reason that Plaintiff comes before this Honorable Court representing himself *pro se*. Judicial review is particularly applicable to laws purportedly passed not under an enumerated power, but under the *"necessary and proper"* clause, and which violated Bill of Rights

## SUMMARY OF COMPLAINT

### (*Predicated Acts of Fraud*)

*Before this Court, as a threshold matter, do the 5th 6th & 14th Amendments of the United States Constitution protect the individual rights of all its citizens? The matter before this Honorable Court demonstrates that a number of defendants herein collectively aiding in abetment of fraud and as part of an "enterprise" have altogether behaved as if that Complainant has no rights at all, effectively erasing the Bill of Rights. The illegal actions of defendants and those acting in concert in each decision and order findings having no basis in law or logic to support the outcomes. No citizen deserves second class status, each claim for relief presented in this brief spell out the danger of the tyranny when the State Court jurists, in concert with individuals committing the crimes controlled by the judicially powerful, can erase a citizens' Constitutional rights by judicial fiat.*

## Statement of Fact

18.     In light of the mistreatment administered against Complainant by jurists involved in this on-going *"enterprise,"* when one considers the term of *"equal justice"* in the State of New York term *"non-existent"* is synonymous. Another term that sums up the horrific events listed below is *"dangerous"* to the well-being of a free society. From the onset of this action, this has been no re-litigation of a divorce proceeding by a disgruntled litigant. This action reaches far beyond any divorce proceeding. Complainant's divorce was the needed tool used an *"enterprise"* to aid and abet commission of numerous acts of fraud under the *"color of law,"* to extort millions of dollars in retribution against Complainant for prior *"whistle-blowing"* activity.

[6]

19.     The inception for "Claim for Relief" involved jurists in the Supreme Court, Richmond County, and continued at every level of the Court system of the State of New York, including the Appellate Division, Second Department, which intentionally ignored and omitted to state or misrepresented the true facts surrounding each of defendants true intentions. In each instance, these co-actors engaged in the intentional denial of Complainant's civil rights and intentionally ignored each predicated criminal act herein listed. Crucial is that this Honorable Court be made aware that Complainant had appealed each of the claims listed below in a timely fashion to the State's highest Court, the Court of Appeals. Said Court recklessly, or culpably, cooperated in this "*enterprise*" by conduct including, but not limited to, a secret scheme, artifice, or plan under the "*color of law*" to protect the illegal behavior of defendants in the lower Courts in a cover-up. In order for the "*enterprise*" to accomplish its goal it was necessary for these co-conspirators repeatedly to act absent of "*subject-matter jurisdiction*" to deny Complainant "*due process*" and "*equal protection.*" The excuse repeatedly given by the Court of Appeals for not addressing each violation of Complainant's civil rights was this legally meaningless statement:

> "*ordered, that the said motion(s) for leave to appeal be and the same hereby is dismissed upon the ground that the order sough to be appealed from does not finally determine the action within the meaning of the Constitution;…*"

20.     At all relevant times the defendants, individually and in concert, directly and indirectly engaged, and participated, in, or aided and abetted, a continuous course of conduct and "*enterprise,*" under the "*color of law,*" to conceal the illegal tactics and devises employed by defendants' named herein that were/are repugnant to the U.S. Constitution of this United States. At all times, throughout each "Claim for Relief" listed below, absent "*subject-matter jurisdiction*" under the "*color of law*" defendants' issued "*reports* " and "*Orders*" that failed to hew to precedent held by the Supreme Court of this United States, *see*, <u>Goldberg v. Kelly</u>, 397 U.S. 245, 271, 299:

> "*…that for a full and fair hearing to have occurred, the courts must demonstrate compliance with elementary legal rules of evidence, and must "<u>**state reasons for their determination**</u>" and, the courts must indicate what evidence was relied on.*"

21.     At all relevant times, jurists failed to articulate the reason for the repeated departure from "*public policy,*" "*regulatory requirements,*" "*statutes,*" "*case law,* and, "*precedent*" by the Court of Appeals and Supreme Court of this United States. Each Court (jurisdiction) before which

[7]

Complainant appeared repeatedly, consistently, and continuously, and intentionally ignored the applicable doctrines of *laches* and judicial *estoppel*, and recklessly violated the "*equal protection clause*." These denials will be dealt with in a separate action.

22.    Federal Justice Richard Arnold *see, Anastasoff v. United States*, 233 F.3d 898. has held:

> "*declared that unpublished opinions are not precedent and are unconstitutional because the framers, in speaking of "judicial power" in Article III, would have had in mind the common law courts of the time, **which consider themselves fully bound by their prior decisions**.*" [The *en bance* Circuit Court vacated that panel ruling, but for unrelated reasons.)

23.    Jessie Allen, associated counsel at the Brennan Center for Justice at New York University School of Law, questioned whether opinions designated unpublished are truly rote applications of existing law, as asserted by most judicial commentators, has held:

> "*No-citation courts, in effect refuse to hear litigant's arguments that challenged judgment is inconsistent with court's rulings in other cases. Refusing to hear argument for consistent judicial treatment raises serious 'due process' concerns, especially given the strong association of consistency with fairness and correctness in our legal culture.*"

24.    At all relevant times, defendants individually and collectively acted in concert, directly and indirectly, engaged, and participated, in, or aided and abetted, a continuous course of conduct and enterprise to deny Complainant civil rights by employing under the color of law and *absent "subject-matter jurisdiction"* devices, schemes, and artifices to defraud and engage in acts, practices, and a course of conduct as alleged in greater detail above and below in an effect to conceal the true motives of those conspirators named herein in violation of precedent held by the Supreme Court of this United States in *Mathges v. Eldridge*, 424 US 319 344, which has held:

> "*The rules "minimize substantively unfair treatment or mistake, deprivation by enabling a person to contest the basis upon which a state proposes to deprive them of protected interest.*"

*Cary v. Piphus*, 435 US 259:

> "*Procedural due process rules are meant to protect persons not, from deprivation, but to contest from the mistake or justified deprivation of life, liberty or property.*"

Special Note: Each of the Claims for Relief has its genesis in the illegal actions of Defendant Judicial Hearing Officer, Lester Sacks, who in absence of *"subject matter-jurisdiction"* as a principal co-actor in the *"enterprise"* ruled by judicial fiat beginning on March 14, 1990, intentionally ignoring the legal fact that on October 14, 1986, a Court of decisions, the Appellate Division, Second Department had previously established *"law of the case."* Defendant Sacks's illegal behavior continued up until through 2004. A final decision was issued by the Court of Appeals on March 23, 2006. Each predicated act referenced herein occurred after the effective date of RICO and within ten (10) years of each other.

---

25.     Complainant brings this Claim for Relief asserted herein pursuant to the Federal Rules of Civil Procedure against defendants and all members of their immediate families, any entity controlled by them, and their heirs, successors, assigns, partners or principles for damages sustained as a result of defendants' wrongful conduct, as alleged herein. Complainant has suffered severe damage, and continues to suffer, apart from what he has suffered as a result of the wrongdoing alleged herein. Absent a RICO action, defendants will likely retain the benefits of their wrongdoing.

26.     Complainant will address all common questions of law and fact that exist as to any individual action brought under RICO:

    (a) Whether defendants participated in and pursued the wrongful concerted actions complained of herein.

    (b) Whether RICO was violated by defendants' acts as alleged herein.

    (c) Whether Complainant had sustained damages and, if so, the proper measure of damage.

27.     Mailing on behalf of defendants' through the U.S. Postal service constituted an indictable offense under 18 U.S.C. 1341. Defendants intended to, and did, employ the mails in furtherance of their unlawful scheme to misuse the Courts a defraud Complainant.

28.     Defendants' repeated false and misleading factual statements set forth in greater detail contained in affidavits, affirmations, testimony, were made for the purpose, under the "color of law," absent *"subject-matter jurisdiction"* and with intent, to deceive and manipulate the higher Courts in order to defraud Complainant. Thereafter, each Court in the State of New York turned

[9]

a blind eye to the evidence presented before it and intentionally, recklessly, consistently, and continuously relied upon each false and misleading statement (*made by Defendants Maida and Strauss under oath*) that caused Complainant to be defrauded out of millions of dollars.

29.   Between September 1985 and 2006, defendants Maida, Strauss and others acting in concert with them and hindered Complainant's ability to defend his civil rights, agreed and conspired among themselves to pursue their unlawful scheme. In furtherance of that scheme, defendants (a) accumulated a substantial stake of Complainant's assets, (b) threatened Complainant to take his home, and did, forced Complainant to repeatedly take out unnecessary mortgages to pay fraudulent interest, based upon fraudulent money judgments in order to keep retain title of his home; and forced Complainant to pay unwarranted court costs, sanctions, and legal fees. In the process, defendants agreed and conspired among themselves (and others unknown to Complainant) to commit, and did commit, acts of mail fraud in violation of 18 U.S.C. 1341. Defendants knowingly, willfully, intentionally repeatedly, continuously, and consistently committed each of those acts as part of a *"pattern of racketeering"* activity designed to defraud Complainant in pursuit of short-term and long-term profits for themselves and to harm Complainant.*

*Special Note: Complainant will demonstrate each act of fraud was committed with total judicial impunity. A repeated, denial of Complainant's *"due process"* and *"equal protection"* rights intentionally occurred to make good a threat made by judicially influential individuals, including sitting justices (that control the New York State Court system) in an on-going *"scheme"* against Complainant for his prior whistle-blowing against them and others (*in the hundreds of millions of dollars*) and for reporting some justices to the Judicial Conduct Committee. Conclusive proof will be presented herein, supported by a preponderance of evidence that will far exceed reasonable doubt concerning each of these allegations.

## DEFENDANTS' ILLEGAL ACTS AND UNLAWFUL SCHEMES

Please Take Special Judicial Notice: At all times, the ongoing acts of fraud were before each level of the Courts in the State of New York. No assumption can be made that Complainant had abandoned this RICO claim in conjunction within any lapse in time. From the onset, the first act of fraud, in monies formulated on November 13, 1990 at a Court conference, and continuing up until and including December 20 1999, Complainant was before the Courts in a timely fashion until March 23, 2006 at which time Complainant's remedies were exhausted in the State of New York.

At all times Complainant was within the statute of limitations. Each allegation made by Complainant herein occurred in reaction to of the on-going scheme predicated on the first act of fraud, to bankrupt Complainant. At no time did Complainant neglect legally to do what should have done, what was legally warranted. At no time did Complainant fail to pursue due diligence, to do what in law, he should have done. This action is finally ripe for adjudication in a Federal Court based upon "*due process*" and "*equal protection*" violations of Constitutional law denied at the State level in conjunction with the statutes outlined in the RICO statute. The final Order by the Court of Appeals for the State of New York, dated March 23, 2006, that blatantly refused to address the allegations set forth herein, thereby denied Complainant "*due process*" and "*equal protection*" with no legally coherent reason or justification. It did so by glibly asserting the following legally meaningless statement

> "*ordered, that the said motion(s) for leave to appeal be and the same hereby is dismissed upon the ground that the order sough to be appealed from does not finally determine the action within the meaning of the Constitution;...*"

30.     The original amount of fraud defendants Strauss and Maida's in cash monies amounted to $490,357.00. Said monies first changed hands on May 22, 1995. On May 16, 1997, associated with this same act of fraud, they (defendants) fraudulently stole under the "*color of law*" another $84,885.00. On October 4, 2002, based upon the same act of fraud, they took $210,000.00 accounting for illegal interest and costs. On June 14, 2005, they stole $1,105,765.00. (additional acts of fraud took place between said dates, accounting for additions amounts exceeding $2,000,000.00). Complainant's appeals about each of these on-going acts of fraud have been before each level of the New York Court system since the inception of the illegal behavior in 1985. Each level of the Court repeatedly and intentionally refused to address the illegal pattern of activity alleged herein. Thus protecting those involved.

31.     Upon information and belief, the defendants, setting out with a design intentionally, maliciously, wantonly, and fraudulently to inflict maximum damage on Complainant, entered into agreements, combinations or enterprise to defraud Complainant by obtaining, or aiding in obtaining payments, or allowance of fraudulent or false claims illegally to take Complainant's assets (stock, stock dividends, cash, monies earned, and home) accumulated after October 5, 1983 through 2006. This concerted misbehavior was concealed from Complainant, until the occurrence of subsequent events made evident the precise nature of their scheme to defraud.

32    From on about and between October 5, 1983, July 2, 1985 and March 23, 2006, and at all times material to this Complaint, Defendants, Maida, Strauss, the law firm of Wachtel and Masyr, LLP et al., constituted an *"enterprise"* as defined in Title 18, United States Code, Section 1961 (4), to wit, a group of individuals associated in fact, to defraud Complainant.

33.    The Complainant seeks a judgment invalidating any and all monetary judgments paid to Defendant Maida issued by the Courts in the State of New York, which were based upon fraud, on the grounds that said findings were/are inconsistent with the State and United States Statutes and offensive to the United States Constitution. The findings of the New York State Courts in the matter of *Purpura v. Purpura*, were repeatedly, continuously, and consistently inconsistent with rules and precedent promulgated by the Supreme Court of this United States. The State Courts improperly and illegally expanded the judicial powers of the State Courts. Hence Complainant seeks issuance of a Summary Judgment overturning each finding of the State of New York Court that absent *"subject-matter jurisdiction"* violated the *"law of the case"* established on October 14, 1986 by a court of decision and just indemnification by those named herein in for their illegal behavior as part of a larger enterprise to defraud that continued in nature up until March 23, 2006, and which damage continues to the present.

34.    At no time did Complainant neglect to do what one should have done, as right warrants. At all times Complainant did pursue due diligence, to do what in law, should have been done. At all times, Complainant appealed and made repeated legal applications based upon the statues in timely legal fashion.

35.    At no time were any allegations set forth herein addressed by a State court, despite overwhelming and incontrovertible material evidence. The New York courts with no explanation, repeatedly, continuously, consistently, intentionally, and maliciously departed from prior policy, precedent, and legislative intent of the statutes. By so doing they violated the New York State and United States Constitution.

36.    No <u>Court Order exists</u> in the State of New York that would demonstrate that any  act of fraud listed herein ("Claims for relief") were previously adjudicated by a *"full and fair"* hearing in the State of New York. <u>Nor was any evidence presented by any Court in the State of New</u>

<u>York to disprove a single act of fraud presented by Complainant herein</u>. The uninterrupted continuance of the original act of fraud at all time tolled the statute of limitations. By law, Complainant could not bring an action for damages in Federal Court until the final appeals process was exhausted in the State of New York, which was finalized on March 23, 2006. Damages had not ripened until that time.

37.    Defendants named herein maliciously, wantonly, willfully and fraudulently deceived the courts by presenting fraudulent misrepresentation of fact, misrepresenting State law, and ignoring rules of procedure with the design to inflict maximum pain and damage upon Complainant, who has suffered economic damages <u>far exceeding</u> $10,000,000.00 and are still to be calculated. In addition, by law, defendants are liable for punitive damages. The evidence demonstrates each act of fraud took place *"under the color of law,"* and absent *"subject-matter jurisdiction."*

<u>Special Judicial Notice</u>: A timely Civil Rights action related to Article III, Section 2, which extends the jurisdiction to cases arising under the U.S. Constitution pursuant to Title 42 U.S.C. 1983, for violations of certain protections guaranteed by the Fifth, and Fourteenth Amendments of the Federal Code. Under the *"color of the law"* as individuals and in their official capacity, defendants associated with the New York State Court system as an *"enterprise"* absent *"subject-matter jurisdiction"* intentionally to violate Plaintiff's civil rights. Additional jurisdiction set forth in that action are violations of U.S.C. 1961(1)(3)(5), 1962(c)- 1968 (RICO), Title 42 U.S.C.A. 1985 (conspiracy to interfere with civil rights), 42 U.S.C.A. 1982 (*interference with property rights of citizens*) in their capacity as individuals and officers of the Court. 28 U.S.C. 1332(a) is being perfected against individual court officials for using their official capacity in State Courts and agencies, (*enterprises*) intentionally to inflict harm upon Complainant as payback for Complainant's prior whistle blowing in the hundreds of millions of dollars. These individuals intentionally refused to protect Complainant's civil rights as a matter of law and/or public policy, based upon consideration of *"equal protection"* and *"due process"* for which no excuse exists. Those accused individuals acting in their official capacity illegally used the State Courts and official agencies *"under the color of law"* and absent *"subject-matter jurisdiction"* as their personal weapon to harm Complainant and deny him his civil rights.

## ALLEGATIONS OF WRONGDOING

38.    In this action, Complainant will demonstrate a grossly disproportionate number of illegal acts committed by defendants Maida and Strauss, et al, that were intentionally overlooked by all three levels of the State Courts. Complainant will prove defendants Strauss and Maida, with impunity, repeatedly misled the Courts by asserting materially false and misleading (set forth in

greater detail below) statements as if they were facts, among others, and negligently omitted to state material facts necessary for any honest Court to come to a fair conclusion of law. Defendants' Strauss and Maida's illegal behavior was prevalent throughout the protracted motion practices at all levels in the State of New York system, which intentionally allowed defendants to commit the repeated acts of fraud listed herein. One example of Defendant Strauss's *modus operandi* his repeated submission of *"Money Judgments"* for a justice's signature that failed to conform to any decision and Order issued. Following each signature, defendant Strauss brazenly issued Restraining Orders illegally to collect funds, using the U. S. Postal Service in violation of the Federal Mail Fraud statute, 18 U.S.C. (1982), carrying out the referenced scheme or artifice to extort monies from Complainant. The allegations contained herein are not limited to the first claim. Strauss's *modus operandi* was repeated throughout this protracted litigation, as will be proven. This illegal pattern of activity started with the first pleading (1985) and continued uninterrupted until 2006.

Please Take Special Judicial Notice: Complainant repeatedly appealed each act of fraud listed below was repeatedly before the State Courts in a timely fashion. As a last resort Complainant made application for review of each act of fraud, to include other illegal predicated acts listed below. On June 30 2003, the Administrative Justice for the Second Judicial District, Ann T. Pfau, for the State of New York (*making this complaint within the statute of RICO ripe until 2013*) ordered that the allegation of fraud below be reviewed and adjudicated to ascertain whether the allegation presented herein took place, and whether, by law, previous decisions and Orders were to be vacated. The Trial Court, J.H.O. Lester Sacks and Acting Justice Rachel Adams acting in concert, with defendants, Maida and Strauss refused to comply with said Order, and repeatedly issued false and illicit Orders that falsely said the matters had been previously heard and denied. These false and illicit Orders were unsupported by any Court Order to justify said claim. Complainant will prove *"beyond any reasonable doubt"* that some jurists, acting as part of the *"enterprise,"* intentionally *"obstructed justice"* in order to protect fellow conspirators. Throughout each application, Complainant was intentionally denied *"due process"* and *"equal protection."* As will be shown below, each decision and Order issued by the State of New York violated precedent set by the Supreme Court of This United States, *see*, <u>Goldberg v Kelly</u>, 397 U S 254,271,299, Also, *see*, <u>Anastasoff v. States</u>, 233 F.3d 898.;

39.     Complainant will demonstrate each allegation herein beginning with the "First Claim for Relief" by "a clear, convincing, cogent, and unequivocal "preponderance of the evidence" that far exceeds "any reasonable doubt." At all times, Complainant will herein adhere to Rule 9 (b) of the Fed. R. *Civ. P. that requires that "the circumstances constituting fraud … be stated with particularity." See*, RICO case, <u>Bennett v. Berg</u>, supra at 1062.

[14]

FIRST CLAIM FOR RELIEF
(Claim for Violation of 1962/4 of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

There are/were additional players who are/were part of the *"enterprise"* that will be introduced in separate claims for relief that preceded this first act of fraud. More appropriate is to address this first claim for relief to demonstrate a clear and irrefutable pattern of activity that took place prior, during, and subsequent to this first act and repeatedly took place throughout Complainant's protracted litigation in the State Courts in absence of *"subject-matter jurisdiction"* up until, and ending, in year 2006.

First Act of Fraud:
($536,335.87)

Note: Additional losses caused by this first act of fraud are outlined in the 17 Claim for Relief that exceeds $4,000,000.00

40.     Paragraphs 1 through 39 and 40 hereof of this Complaint are re-alleged and incorporated by reference.

41.     The defendants knowingly, recklessly, or culpably engaged in the scheme by conduct including, but not limited to, adopting a secret scheme, artifice, or plan to take control of Complainant's assets.

42.     Defendants are each a *"person"* as the term is defined in RICO 18 U.S.C. 1961 (3).

43.     At all times relevant to the events alleged within this complaint, defendants were associated with the *"enterprise"* as the term is defined in sec. 1961(?) of RICO, 18 U.S.C. s1961(?) which engaged in interstate activities. For the purpose of this claim under 18 U.S.C. 1962 the *"enterprise"* consisted of defendants Sacks, Adams, Strauss, Maida or, in the alternative, the law firms named in the caption comprised an association-in-fact of each member of the law firm.

44     In violation of, 18 U.S.C. 1962, defendants have received and conspired to receive, directly or indirectly, or alternatively, an association-in-fact of each member of the law firm income derived from a *"pattern of racketeering"* activity and have used or invested, or conspired to use or invest, directly or indirectly, such income, or proceeds of such income, in the operation of their law firms. The above-referenced monies (exceeding $5,000,000.00) received by defendant Maida and the law firms, are still to be computed.

[15]

45.      Defendants engaged in the above-referenced violations of s1962 (c) of RICO through a pattern of racketeering activity, as that term is defined in 1961(1) (5), and (D) of RICO s1961 (1) (5) and (1968 U.S.C. 1961(1)(5), 1962(c)- 1968 (RICO), Title 42 U.S.C.A. 1985. The racketeering activity in which defendants engaged is alleged in greater detail below of this Complaint and includes (a) violation of the Federal Mail Fraud Statute, 18 U.S.C. s1341 (1982), that enabled defendant to effect the above-referenced scheme or artifice to defraud monies from Complainant and, as alleged in greater detail, acts of wire fraud, by which the defendants, individually and as law firms, engaged in violation of Federal Wire Fraud Statute, 218 U.S.C. s1343 (1982) to defraud monies from Complainant.

46.      Each predicated act of wrongdoing referenced herein occurred after the effective date of RICO and within ten (10) years of each other. Each of the defendants' racketeering activities was undertaken for the purpose of furthering their common scheme to defraud monies and other assets belonging to Complainant. Each such act of racketeering activity had similar purposes, involved the same or similar participants and had similar results impacting Complainant was part of a recurring pattern of similar schemes described in each paragraph listed above and below. Thus, each such act constituted a pattern of Racketeering Activity as that term is defined in s 1961(1) of RICO. Each defendant agreed and conspired with other defendants and/or co-actors to commit the referenced predicated acts.

47.      As a direct and proximate result of defendants' activities and conduct in violation of 1962 RICO, Complainant has been severely injured in his business and property. Under the provisions of s1964(c) of RICO, Complainant seeks to recover herein treble damages and the cost of bringing this action, including reasonable attorneys' fees.

Material Evidence of this First Act of Fraud:

48      The Supreme Court, Richmond County, J.H.O. Sacks presiding (hereafter Sacks) issued four prospective decisions, (see the first starting in 1988 Exhibits 1 through 31). In each decision absent "subject-matter jurisdiction" the Court mandated that division of marital assets were to be dispersed as of September 7, 1988.

Please Take Judicial Notice: By law, the date of September 7, 1988, intentionally and illegally chosen by J.H.O. Sacks violated statute as mandated by the Legislature for the State of New York. In the paragraphs below Complainant will show how some jurists (co-actors) in N.Y.S. courts also acting absent *"subject-matter jurisdiction,"* acted in concert to aid and abet in this first act of fraud. A separate civil suit is being perfected pursuant to Article III, Section 2, which extends the jurisdiction to cases arising under the U.S. Constitution pursuant to Title 42 U.S.C. 1983, for violations of some protections guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the Federal Code.

49.    A conference was held on November 13, 1990, to address the division of marital assets in compliance with each of Sacks's decisions, *see*, (1) Memorandum of Law, 1-11: (2) Findings of Fact, 12-20; (3) Judgment, 21-27; and, (4) his final Order, 28-62 dated January 31, 1991,

50.    Trial Transcript of the conference (hereafter TT. *see*, (Exhibit 32-62] comprise conclusive proof that Defendant Strauss repeatedly acknowledged the date of valuation chosen by Sacks. Complainant will prove defendant Strauss knowingly committed fraud using creative accounting and misrepresentation related to this valuation date to steal money from Complainant. *See Strauss's testimony:*

 Page 6; (Exhibit 37) *"The court has asked we use September 7, 1988 as a  valuation date... as of September 7, 1988 valuation date...."*
 Page 7: (Exhibit 38) "*all that remained as of September 7, valuation date...*"

51.    Instead of adhering to the Court's direction, Strauss, through deception and deceit intentionally and recklessly misrepresented material facts concerning monies received by Complainant in connection with some sales of common and preferred stock that postdated the valuation date ordered by the Court. He falsely claimed that his client was entitled to portion of said monies that did not exist. He intentionally and recklessly concealed the material fact that the monies referred to, $1,065,165.17, had been received by Complainant prior, not subsequent to September 7, 1988, the date chosen by the Court for division of marital assets.

52.    The evidence before the Court conclusively proved that the monies Strauss sought to secure at the November 13, 1990 conference before J.H.O. Sacks (and which Sacks subsequently awarded to Strauss's client had been legally acquired by Complainant prior to September 7, 1988 and had been expended by a prior lien. Defendant Strauss knew that defendant Maida had no legal right to 35% of these monies. The Court decision (Exhibit 1-31) was/is explicit. Strauss's

client was only entitled to a percentage of sales of common stock that occurred <u>after, not before,</u> September 7, 1988. Despite this clear and precise court cut-off date, on the record Strauss blatantly falsified and misrepresented to the Court the base amount from which his client's 35% award was to be determined as $1,065,165.17 monies Complainant had received from sale of common and preferred stock prior to September 7, 1988. On page 9 of the transcript (Exhibit 40) Strauss mendaciously told the Court:

"*Applying the thirty-five percent factor to this 1,065,165.17 of sales proceeds, we say that the plaintiff* (defendant Maida) *is entitled to $372,807.75.*"

53.     Attached as, Exhibit 63 is a <u>true schedule</u> of (pre-taxed) gross sales of common and preferred stock that took place over the years <u>prior</u> to September 7, 1988. That amount was $1,065,165.17. A review of the schedule conclusively proves each sale took place <u>prior</u> to September 7, 1988, the date selected by the Court for division of remaining assets. *Complainant did not receive any of these monies, since a prior lien existed on these monies by U.S. Trust Company. Strauss repeatedly perjured himself before all three Courts in the State of New York, falsely claiming in sworn to affirmations that Complainant had pocketed these same monies.* Defendant Sacks, acting in concert, with Strauss intentionally disregarded the evidence that proved Complainant had received these monies in contention had been received prior to the Court's direction. He intentionally signed Strauss's judgment a judgment actually <u>submitted by Strauss,</u> in amount of $372,807.75, thereby aiding in this act of fraud.

54.     At this same conference, defendant Strauss committed misrepresentations, concealed material facts, and submitted *__three fraudulent schedules__* that specified additional amounts of money supposedly due his client in conformance with the direction of the Court. [*These fraudulent schedules have mysteriously disappeared from the Court file.*] Still in the Court file is the Trial Transcript that conclusively proves that the schedules Strauss submitted and referred to on the record were: (1) false and misleading: and, (2) Strauss's intentionally gave false testimony related to monies due his client, see page 10, (Exhibit-41) of the Court transcript, Strauss's statement of fact set forth on the record, he says:

"...the Court has directed that we use September 7th. 1988 as the valuation a date. __I have merely subtracted out payments subsequent to September 7, 1988 as reflected on those two schedules for a total of 178, 468.97__ in dividends and interest income paid to Defendant in connection with Bear Stearns stock. Applying your Honor's thirty-five

[18]

> *percent factor to that, we say that plaintiff is entitled to the sum of*
> *$62,464.14"*

55.    Strauss's statement was an evident lie, attached as Exhibit 64 is a true schedule of dividends that Complainant received *subsequent* to September 7, 1988. The exhibit conclusively shows the total Complainant received subsequent to September 7, 1988 was $18,830.01, not $178,468.97. Applying the Court's 35% factor to the true amount of dividends received Strauss's client was only entitled to $6590.50, not $62,464.14. Through defendant Strauss's fraudulent, deceptive, and false schedules he was able to defraud Complainant out of an additional $56,873.64, I quote defendant Strauss's exact words, mendaciously claiming to the Court:

> " *I have merely subtracted out payments subsequent to September 7,*
> *1988 as reflected on those two schedules for a total of 178, 468.97"*

56.    Repeatedly, in each appeal and application thereafter, Complainant demanded Strauss produce the two "*missing*" schedules submitted during the conference that supposedly listed monies Complainant received subsequent to September 7, 1988, that would demonstrate that the 35% amount to which his client was entitled really  is equaled $62,464.14. [*Strauss, a graduate of the Wharlton School of Business, should have known, the amount to which his client was really entitled*]. Again, those so-called mysterious schedules are no longer part of the court file! [*The culprit that removed Strauss's schedules made one grave mistake. He/she forgot to remove the court transcript that supports Complainant's allegations of Strauss's deceit and constructive fraud*]. In an act of connivance with defendants Strauss and Maida, defendant Sacks accepted Strauss's fraudulent schedules and perjurious testimony, and signed an Order awarding defendants an additional $62,464.14  bringing the total fraud to $428,681.39 in pre-taxed dollars.

57.    At the same November 13, 1990 conference Strauss defrauded additional money (committed his third fraud) falsely claiming that Complainant had received $131,590.32 from sale of "group securities" subsequent to September 7, 1988. Actually, sale of these group securities had occurred prior to September 7, 1988. Prior to September 7, 1988, Complainant had received $133,675.91 from sale of "group securities." Subsequent to September 7, 1988 Complainant had received only $2,085.39 from group securities. Yet on pages 10 and 11 of the TT (Exhibit 41-42), Strauss lied to the Court about the dates of the sale of the securities. He tried to obscure his lie and hide the steps involved in his act of theft from defendant Sacks by

subtracting the base money from which his client was legally entitled a percentage $2,085.39 (money received by Complainant after September 7, 1988) from the base money from which his client was entitled no percentage, $133,675.91 (monies received by Complainant before September 7, 1988). Intentionally misleading the Court Strauss said:

> "*The total reflected on Plaintiff's Exhibit 108 was 133,675.91, and the Court will note there is only one distribution shown at the bottom of that schedule <u>as being subsequent to the September 7, 1988</u> valuation date used by the Court. That being so, I have merely subtracted the miscellaneous distribution shown in the amount of 2,085.39 as having taken place on May 16, 1989, and I have come up with a total of 131,590.32 as being the amount of proceeds received by Defendant in connection with "group securities" interest. Applying your Honor's thirty-five percent factor, I come up with a sum of 46,056.68.*

58.    Again, in violation of the Court's decisions (*see* Exhibits 1-31 ), instead of requesting 35% of the $2,085.39 received by Complainant subsequent to September 7, 1988 (that would amount to $729.88), Strauss, subtracted $2085.39 from $133,675.91, came up with a figure of $131,590.32, and recklessly misrepresented to the  Court (Sacks) that his client was entitled to 35% of 131,590.32 ($46,056.86) the total amount of which Complainant had received <u>prior, not subsequent, to the Court's September 7, 1988 valuation date.</u> Strauss submitted a fraudulent figure of $46,056.68 to Sacks, who again ignored the evidence, accepted Strauss's mendacious testimony, and awarded monies that rightfully belong to Complainant.

59.    As a direct result and proximate result of the foregoing misconduct of defendants' constructive fraud, Complainant sustained additional substantial damages. The total fraud had now risen to $474,737.97 in pre-taxed dollars.

60.    Using this same fraudulent tactic, at this same November 13, 1990 conference *see*, TT pages 11-12, (Exhibit 42-43) defendant Strauss, on the record falsely claimed:

> "*...partnership profit distributions paid to Defendant subsequent to incorporation of the partnership. These distributions were reflected in plaintiff's 113 in evidence was $78,338.00. The Court will note that the <u>schedule</u> reflects only one distribution to defendant subsequent to September 7, 1988 valuation date chosen by the Court. That being so, I have subtracted out two thousand, three hundred and forty-four dollar distribution made on March 8th, 1989, and I have come up with the figure of 75,994.00 as being the total of partnership profit distributions paid to the Defendant subsequent to the incorporation of Bear Stearns, Applying your Honor's thirty-five percent factor, I have come up with the figure of*

61.    In an act of malicious deceit defendant Strauss intentionally misrepresented the true facts surrounding the above matter. The incorporation of partnership profit distributions had/has nothing what-so-ever to do with monies remaining as of September 7, 1988 or the instructions mandated in the Court's four (4) decisions.

62.    The Court's decisions had directed that defendant Strauss's client was to receive 35% in monies received *subsequent,* not prior, to September 7, 1988. Subsequent to September 7, 1988, Complainant had received $2,344.00 (Exhibit 64)  in sale proceeds of partnership distributions. Thirty-five percent of sales of $2,344.00 amount to $820.40, not $26,597.90. Strauss fraudulently subtracted monies that Complainant received partnership distributions received subsequent to September 7, 1988 from the total amount Complainant received prior to September 7, 1988. *See* Exhibit 64 actual sales transactions. Then through his misrepresentation and materially false and misleading statement of fact set forth above, he requested 35% of $75,994.00 amounting to $26,597.90. He negligently omitted to state the material facts necessary to present an honest amount of monies due his client. As a direct result, his fraudulent behavior was the proximate cause of substantial economic damage to Complainant increasing the sub-total of the on-going theft to $501,335.87.

63.    In an act of surreptitious theft, paragraphs 55 through 57 on page 25, (Exhibit 56) of the Court transcript, defendant told the Court that:

> "...*Bear Stearns has informed me (Strauss) that they're holding $100.000.00 for   this man in connection with the sale of 57th Street property*"

64.    As a result, Strauss's client received an additional $35,000.00 in monies rightfully belonging to Complainant derived from a total investment of $306,557.00, of which Complainant had lost $206,557.00. Complainant had recovered $100,000.00 from that bad investment subsequent to September 7, 21988 by law, these investments should not have been part of marital distribution, as will be proven below, because Sacks ignored the fact that a valid "*separation agreement*" existed and had been found to be "*law of the case.*" In short, J.H.O. Sacks lacked "subject-matter jurisdiction" to set September 7, 1988, as the cut-off date for valuation of assets. Defendant Sacks established this date by judicial fiat, in violation of New York State law.

Please Take Judicial Notice: Unbeknown to Complainant at the time, and not discovered until years later, these above acts of fraud were no mere "*mistakes*" by defendants Sacks, Strauss and Maida, who were acting in connivance, as will be shown in additional claims listed below. In tape-recorded telephone conversation, Defendant Strauss admitted he was acting as part of an "*enterprise*."

(a) Most importantly, defendant Strauss made the following admission *see* (Exhibit 55-56), page 23, lines 24-25 & page 24, line 2:

> "...*What I understood, Your Honor to be looking for values as of September 7,      1988, that date chosen in your memorandum decision.*"

(b) At this same conference Strauss, attempted surreptitiously to steal an additional $84,000.00 of partnership investment amounting to $240,000.00 that had gone bankrupt prior to September 7, 1988.

(c) A review of the transcript is clear, when the Court (J.H.O. Sacks) was questioned by Complainant's attorney, *see* (Exhibit 47-48, 51), page 16, 17, page 20, defendant Sacks himself confirmed that distribution was to be: "*as of September 7, 1988.*"

(d) In an act of "*unjust enrichment*," defendant Sacks awarded $39,500.00 to Strauss's client, representing 50%, net of a real estate property sold for $79,000.00 gross, Complainant received less than $14,000.00, net on property that was purchased the day  the parties' had legally separated, with borrowed monies,. No Court has yet to address this issue.

Please Take *Special* Judicial Notice: As stated above defendant Sacks **did not make a mistake.** A hearing was ordered by the Administrative Justice Pfau in 2003, to address these same allegations of fraud. A reporter from the *New York Post* attended hearings on March 9, 2004, and November 16, 2004, concerning these same predicated acts of fraud, and the Courts unwarranted sanctions and legal fees. At the conclusion of the hearing, the Court and Strauss were made aware a reporter was in attendance. At that point, Strauss stood up screaming, and *threatened the reporter on the record* not to print a word of what transpired.

Below are two quotes from a fax that were sent by this reporter in reply to New York State's Court press secretary, Mr. Brookstaver, who thanked the reporter for keeping his story benign. *See* Exhibit 65. Please read entire Exhibit, a Fax, The *reporter observed:*

(1) "*How Sacks (he looked half dead on the bench, by the way; anyone who spent 10 minutes watching him "work" would have known that something's not kosher in this case) consistently and repeatedly thwarted every attempt Purpura made to cross-examine Strauss about that very issue.*"

(2) "*...the "court" system," as an entity, has only made a vague pretense of treating him fairly – and I'm disappointed my piece didn't more clearly reflect that determination.*"

<u>Each predicated act referenced herein and throughout all proceedings occurred after the effective</u>
<u>date of RICO and within ten (10) of each other.</u> What occurred during these hearings on the
record concerning these same acts of fraud were before the Appellate and Court of Appeals
Court beginning in 1993 and up until 2006. The actions of defendants Strauss, Maida, Sacks, et
al., conclusively prove beyond any reasonable doubt that they were co-actors with Sacks, among
others, and part of an "*enterprise*" conspiracy to bankrupt Complainant for his prior whistle-
blowing.

<u>Note</u>: Strauss's fraudulent schedules were removed from the Court file. Not removed was the
November 13, 1990 Court Transcript. That transcript proves beyond any reasonable doubt that
Strauss committed fraud *in excess of a half-a-million dollars.* At the end of that hearing Strauss
handed Sacks a *pre-written Money Judgment* to be signed.

65.     The above acts of fraud did not end with the payment of $490,357.00. The monies listed
above were finally taken on May 22, 1995, including unwarranted and the illegal award of
statutory interest on this same fraudulent judgment. On May 16, 1997, associated with this same
act of fraud, defendant Strauss stole an additional $84,885.00. Again, on October 4, 2002, based
upon the same act of fraud, defendant Strauss defrauded Complainant of an additional
$210,000.00 in the form of illegal interest and costs. Complainant continuously appealed
defendant Strauss's and Maida's fraud, and J.H.O. sacks collusion with it to each level of the
New York Court system in a timely fashion from 1991 through 2006. <u>To date, no Court Order</u>
<u>exists to show that this matter has been adjudicated by a "*full and fair*" hearing</u>. The continual
illegal pattern of activity alleged herein has been intentionally ignored by the New York State
Courts to protect those individuals and jurists, acting in their official capacity, who were
involved. <u>Each of these predicated acts referenced herein all occurred after the effective date of</u>
<u>RICO and within ten (10) of each other on the same original act of fraud.</u>

66.     Defendants' illegal conduct described above, and their intentional misrepresentation and
concealment of material fact, amounted to constructive fraud, Defendant Sacks signed an Order
dated January 31, 1991 (Exhibit 28-31). As a result, Complainant has sustained monetary
damages in the amounts listed above, and beyond.

<u>Note</u>: Defendant Strauss also intentionally misled the courts knowingly making false assertions
in a sworn to affirmation and testimony on the record, and presenting materially false and
misleading statements of fact set forth throughout. For the purpose of the statute, and to
demonstrate this act of fraud has been before the Courts in continuous pleadings, and sworn
affirmations *see* cross-motion dated June 6, 2003. (Exhibits 71-110)  In prior affirmations

defendants Strauss and Maida represented case studies as if they were relevant case law in defense of their fraudulent behavior. In defense of the act of fraud present in paragraphs above, defendant Strauss relied upon prior authorities, "*Contino v. Contino*; *Harrell, v. Harrel*, and *McGarrity v. McGarrity*, attached Exhibit 66-70. These erroneous authorities were submitted to three levels of the New York Courts as if a similarity there was a similarity, to the situation described above or as an excuse for committing constructive fraud. These authorities have no similarity to the situation described above. " Strauss demonstrated the same deceitful tactic). In, defense of the third claim for relief, Strauss, to protect himself, on page 28 of the Cross-motion (Exhibit 102).

Misrepresenting case studies is/has been an ongoing practice used by defendant Strauss who previously claimed his associate, Ms. Amy Wellman, Esq., did the research on the case law that Strauss presented to the Court excising pertinent sections that would made such authorizes useless, and blaming clerks and others for his misleading representations as will be shown below. Please refer to Exhibit 112-113) a letter forwarded to the Court by Complainant's attorney, Ann detiere, Esq., that confirms this allegation. Also shown and demonstrated throughout each Claim for Relief listed herein that defendant Strauss repeatedly resorted to perjury and deceptive tactics, recklessly misrepresented facts that he knew to be false, claiming, for example, in paragraph 26 (Exhibit 98) in his Cross-Motion dated June 6, 2003:

> "*It appears that he [Defendant] is of the view that the use of September 7, 1988 as the valuation date meant that he was free to sell more than $1,000,000.00 of marital property during the pendency of the action and retain those sales   proceeds   exclusively for himself...*"

Fact; Each of J.H.O. Sacks's decisions, *see* Exhibits 1-31, explicitly state that the valuation date for distribution was "as of" September 7, 1988. What transpired prior is of no moment! Also, the fact is there was a prior lien. This was addressed at trial, and acknowledged by defendant Strauss that any sales taking place concerning that pledged stock belonged to U.S. Trust Company, and not to Complainant. To claim that Complainant retained those monies was a blatant misrepresentation! U.S. Trust Company received them.

Defendant Strauss further perjure himself in the note bottom of page 27, (Exhibit 100) in that same cross-motion. Strauss falsely stated there that Complainant's sales were made in violation of a Court Order. Conclusively proven in Court was that Complainant never violated any restraining Order! Each transaction described in Strauss's Affirmation occurred prior to the issuance of any temporary restraining Order. Defendant Strauss's repeated attempt to portray Complainant in a bad light exhibits his habitual dishonesty. Again, the record conclusively proves that a prior lien by the U.S. Trust Company was on the stock and sales in question, and the monies to which Strauss alludes, were used to satisfy substantial joint debt, including the mortgages pertaining to the two residences.

When these perjurious statements were made in Strauss's affirmation, the issue before the Court at bar was pursuant to an application for "Credits," Complainant had/has clearly proven an

enterprise existed, in which Sacks's took a leading part, one example stands out in which defendant Sacks intentionally refuses to address the issue of "*credits*" in violation of procedural "*due process.*" His prior vindictive behavior becomes even more evident in the September 14, 1990 judgment. In that judgment defendant Sacks or someone else altered the judgment by **inserting hand written directives** on pages, 3-4 (see Exhibits 23-24) that blatantly violated the statutes and contradict prior precedent held by the State of New York in order to defraud Complainant in excess of a million dollars, as will be shown in claim for relief below.

Defendant Strauss's own words and exhibits presented at Trial convict him of perjury. Strauss repeatedly perjured himself before the Trial Court, and Appellate Division, falsely claiming Complainant "*pocketed monies.*" Strauss must be held accountable for this misrepresentation.

Model Penal Code, 241.1. See also 18 U.S.C.A. 1621:

A person is guilty of perjury, if, in any official proceeding, he makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and he does not believe it to be true.

Defendant Strauss is/was repeatedly guilty of "Fraudulent representation." See *Osborne v. Simmons*, Mo.App.23 S.W.2d 1102, 1104. A false statement as to material fact, made with the intent that another rely thereon, which is believed by the other party and on which he relies and by which he is induced to act and does act to his injury, and statement is fraudulent if speaker knows statement to be false or is made with utter disregard of its truth or falsity.

Please take Special Judicial Notice: Complainant had appeared before Justices Sacks and Adams pursuant to CPLR 5015(a) dated 2003, (that addresses factors of "fraud, misrepresentation, or other misconduct") as a basis for relief from a judgment. These factors are applicable to what either occurred prior to judgment and the means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Since the discovered evidence would probably alter the judgment, the "*fraud*" specified in paragraphs 30, 40 through 65, whether extrinsic or intrinsic, Complainant has retained in the in the State provision the term "*misrepresentation*" or other "misconduct of an adverse party" appearing in the Federal provision. The Courts inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute. It is inherent! *see, Glade v. Allied Electric Products*, 135 F2d 590 7th Cir.)

The Court of Appeals for the State of New York held in *Crouse v. McVickar*, 207 N.Y. 213, 100 N.E. 697:

> "*A judgment based upon a fraudulent instrument, on the other hand, or perjured testimony, or any other item presented to an acted on by the Court, whatever it's a fraudulent component, ,may be just an intrinsic fraud and hence vacatable only on direct attack.*"

## SECOND CLAIM FOR RELIEF
(Claim for Violation of 1962/4 (?) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*
(Acting in Absence of Jurisdiction on a matter *res judicata*)

Second Act of Fraud:
($25,793.26)

Note: Complainant stated above that the State Courts of New York repeatedly, continuously, consistently, and intentionally overlooked a disproportionate number of illegal incidents of fraud and repeatedly ruled absent subject matter jurisdiction. Complainant conclusively proved in Claim I , aided by defendant Sacks, that defendants Strauss and Maida, with impunity, mislead the courts to commit fraud. Complainant has alleged and proved that defendant Strauss's *modus operandi* was to submit "*Money Judgments*," he personally prepared, for a judge's signature that failed to conform to the Court's Order. Following such signatures Strauss would issue "Restraining Orders" to collect these fraudulent funds using the U. S. Postal Service. This Second "Claim for Relief" shows Strauss repeating this *modus operandi*. Complainant had placed in the Department of Finance $571,551.00 in cash as an "*undertaking*" that over-secured a $140,000.00 fraudulent judgment. Complainant, by law, was entitled to interest accruing on these monies from the Department of Finance. Using the above described *modus operandi* it able Strauss fraudulently stole an additional $25,793.26 of Complainant's monies.

67.     Paragraphs 1 through 66 and 67 hereof, of this Complaint, are re-alleged and incorporated by reference.

Material Evidence of this Second Act of Fraud:

In association with defendants Maida, Strauss, and Sacks, the law firm of Gold & Wachtel, and Wachtel & Masyr, Strauss used the same tactics he employed above in the first claim for relief. Defendant Strauss submitted a "Money Judgment" at which time Louis Marrero unwittingly sign it believing it complied with his decision and order.

68.     Attached as Exhibit 114-116) is an Order dated May 5, 1997, issued by the Hon. Louis J. Marrero, Justice, Supreme Court, Richmond County.

69.     On July 31, 1997, defendant Strauss presented to the Court a fraudulent Money Judgment (Exhibit 117-120) in the amount of $25,793.26. Justice Marrero had no way of knowing that Strauss, an officer of the Court, was asserting materially false and misleading statements of fact in said money judgment that he presented for Justice Marrero's signature. Strauss's Money Judgment misrepresented the true facts. He said:

> "*ADJUDGED that the Plaintiff shall recover all the interest actually earned on the sum deposited by defendant and held by the Department of Finance which is estimated as follows...*

*ORDERED AND ADJUDGED that the Department of Finance of the City of New funds on deposit in Account No. R 117546"*

70.    Nowhere in Justice Marrero's Order does anything appear remotely close to what Strauss had submitted for Justice Marrero's signature. The Order (Exhibit 116) explicitly stated:

*"additionally, should the final calculations under this Order show in some fashion that the entire amount due plaintiff was not secured in some fashion, those sums not secured earn 9%."*

71.    At all times undisputed is/was that as proven in Claim I, Complainant had over-secured said fraudulent money judgment in excess of $140,000.00 The evidence below conclusively proves defendant Strauss materially presented misleading statements of fact incorporated in the Money Judgment for the $25, 793.26.  Such misrepresentation was an act of intentional fraud. On appeal (22-months later), the Appellate Division, Second Department's found [*see,* Order dated May 24, 1999, pages 2 & 3 (Exhibit 122-4)]:

*"ORDERED that the judgment dated July 31, 1997, awarding the plaintiff interest on the distributed award is reversed, on the law, and the matter is remitted for further proceedings in accordance herein;*

*Although the plaintiff is entitled to recover post-judgment interest, <u>she may not recover interest on that portion of defendant's undertaking which exceeded her net distribution award....</u>"*

72.    The wording, and that reversal of the Money Judgment, supports the allegation Complainant has made in detail above. No legal justification existed to submit that "Money Judgment" for $25,793.26. This submission was an act of fraud. As a direct and proximate result of the foregoing conduct, Complainant has sustained substantial monetary damages. Further proof presented by Complainant demonstrated defendant Strauss's intentional deceit and deception on these same monies. Strauss never returned the monies.

## BACKGROUND CONCERNING THIS ACT OF FRAUD:

In March of 2003 Complainant submitted an application, pursuant to CPLR 5015 and CPLR 3212, to Acting Justice Rachel Adams. Justice Adams in violation of the statute defendant Adams re-assigned the applications to J.H.O. Sacks to "hear and determine." The Administrative Justice for the Second Judicial District on June 30, 2003 ordered that the Trial Court review and adjudicate whether or not "mistakes, or fraud" had occurred, on this alleged act of fraud and the four others outlined in Complainant's first Claim for Relief. This Order this was to take place

within 60-days or returned for immediate trial. Justice Pfau, had altered Justice Adams's order to read; J.H.O. Sacks was to "hear and report." A hearing was finally (in violation of the statute) held on March 9, 2004 concerning Strauss's "five acts of fraud.

73.     Paragraphs 1 through 72 and 73 hereof, of this Complaint, are re-alleged and incorporated by reference entered Defendant Howard Elman, of the law firm of Wachtel & Masyr into agreements, combinations or enterprise, to participate in the racketeering fraud. Elman acted in concert to aid and abet in the enterprise, acting under the *"color of law"* to *"obstruct justice"*

74.     Defendant Elman (*Strauss's partner, in an obstruction of justice intentionally excising a material fact from a memorandum of law, included in case law*). At the March 9, 2004 hearing, on the record, Mr. Elman objected to the terminology *"fraud"* used by Complainant, pointing to the Appellate Division's reversal of the (fraudulent) money judgment 2-years subsequent to the theft, asserting that the May 24, 1999 Appellate Tribunal reversed the fraudulent money judgment, as if his objection should somehow negate the deception defendant Strauss had perpetrated on the Court and his theft of the $25,793.26 in the first instance.

75.     Defendant Strauss who was not in attendance, asserted materially false and misleading statements of fact set forth in greater detail in his cross-motion, to intentionally to misrepresent the true facts to the Trial Court and perjured himself (in New York State *an Affirmation is a sworn to document*). *See* Exhibit 13  in which Strauss concealed and misrepresented his fraud to the Court (defendant Sacks) (*see*, page 19, para. Z. (Exhibit 91) where Strauss falsely says:

> *"Based upon modification, Justice Merrero granted a Judgment, dated July 31, 1997,directing the Commission of Finance to pay Barbara Maida the sum of $25,793. Which was all that was left of the undertaking originally deposited by Defendant."*

76.     The chief problem with Strauss's and Elman's absurd misleading affirmation, statements, and testimony are: (1) the Judgment Marrero signed was fraudulent by secured; (2) the Appellate Court had reversed that fraudulent by secured judgment in May of 1999; (3) the hearing at which Mr. Elman was presented, took place in 2004, and Strauss and his client to date had never returned the stolen monies, along with statutory interest as ordered by the Court in 1999. To add insult to injury, Strauss refused to pay *"a bill of cost"* [in the thousands of dollars] awarded Complainant by the Appellate Court.

77.    As a direct result of defendants' direct and proximate result of the defendant Strauss's foregoing misconduct and constructive fraud, Complainant has sustained severe monetary damages.

Note: Complainant conclusively proved above that defendant Strauss committed constructive fraud. At no time did any Court for the State of New York address: (1) this act of fraud; (2) defendant Strauss was requesting (and received statutory interest) based upon a "*fraudulent money judgment*"; (3) the fact that the original fraudulent judgment was never "docketed" and, by law, whether or not the interest was fraudulently secured, does not accrue until such docketing" and, (4) The fact that Strauss and his client were not entitled to any statutory interest, **because this same issue had been previously before the Appellate Division in the year 1994, and that issue was *res judicata*.** Obliviously, an enterprise existed. Yet, Strauss in his perjurious affirmation asks Sacks "how the above documentary evidence somehow gave rise to a claim of '*fraud*?'"

Please Take Judicial Notice: This entire issue and litigation was *a judicial con-game* taking years to litigate J.H.O. Sacks conducted this hearing in absence "*subject-matter jurisdiction*." To date no Court in New York State has addressed this fraud! This act of pleading fraud not mentioned, on May 24, 1999 accept to have the monies returned to Complainant on Appeal will be addressed in a separate claim. Clearly, that tribunal acted in concert with the lower Court and defendant Strauss.

This second act of fraud in actuality was in excess of $200,000.00, involving numerous justices who, acting in concert as part of an "*enterprise*" intentionally and recklessly, continuously, and consistently interfered with Complainant's civil right to "*due process*" and "*equal protection*." The "*enterprise*" in this instance *absent of "subject-matter jurisdiction" allowed illegal re-litigation of an issue that was res judicata*.

Complainant appeared before J.H.O. Sacks and Acting Justice Rachel A. Adams pursuant to CPLR 5015(a) dated 2003 that was supposed to address factors of "fraud, misrepresentation, or other misconduct" as a basis for relief from a judgment that is applicable to what either occurred prior to a judgment or was a means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Since the discovered evidence would probably alter the judgment, in paragraphs above whether referring to extrinsic or intrinsic fraud. The Complainant has retained in the State provision the words "*misrepresentation*" or "other misconduct of an adverse party," appearing in the Federal provision. The Court has inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute. It is inherent! *see, Glade v. Allied Electric Products*, 135 F2d 590 7th Cir.)

The Court of Appeals for the state of New York held in *Crouse v. McVickar*, 207 N.Y. 213, 100 N.E. 697:

> "*A judgment based upon a fraudulent instrument, on the other hand, or perjured testimony, or any other item presented to an acted on by the Court, whatever the*

*fraudulent component, may be just an intrinsic fraud and hence vacatable only   on direct attack."*

## THIRD CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

Third Act of Fraud:
($15,600.00)                    Statement of Fact

Note: Crucial in this RICO action is the continuing nature of the conspiracy. As Complainant stated above and proved, the N.Y. State Courts repeatedly, continuously, consistently, and intentionally overlooked a disproportionate number of incidents of fraud and attorney misconduct. Complainant has conclusively proved in Claims I, and II that Defendants Strauss and Maida, with impunity, misled the courts to commit their fraud. Complainant has/had alleged and proven that Strauss's *modus operandi* was to submit *"Money Judgments"* that failed to conform to the Court's direction and   Order. Following each signature, Strauss issued "Restraining Orders" to collect fraudulent funds using the U. S. Postal Service. In this Third "Claim for Relief," Defendant Strauss largely repeats   his *modus operandi*. But on this "Restraining Order" no Money Judgment was signed by any Justice.  Strauss fraudulently used the mails and falsely represented the contents of a Court Order, claiming the Court had awarded him $15,600.00 in retroactive money.

Note: On each occasion of Strauss's commission of "fraud" and Sacks's violations of *"due process"* and *"equal protection"* to aid and abet in the commission of each act of fraud, Complainant notified the fraud in a timely manner to the Courts and other State agencies that repeatedly, continuously, consistently and recklessly ignored Complainant evidence.   .

78.    This act of fraud precedes the above acts of fraud contained in Claims I, and II for relief, but clearly demonstrates Defendant Strauss's *modus operand* and that this misconduct was/is within the statute of limitations, occurring within a 10-year period and was previously before each Court up until March 23, 2006.

Note: The United States Court of Appeals, Second Circuit 1039-1042 , dockets 80-1431-80-1434 (Sept.4 1981) in *U.S. of America v. Peter Angelilli, et, al,* held even acts prior to first act alleged in an indictment may be proven to show *"continuing"* nature of conspiracy.

79.    Defendant Strauss repeatedly misled and distorted the findings of Court Orders to illegally defraud monies from Complainant. On October 14, 1986, the Appellate Division, Docket No. 99 NE 2d A.D. (Exhibit 125-7) issued a prospective Order modifying an order of the Trial Court dated November 14, 1985 (Exhibit 128-9). The Appellate Division increased

[30]

Defendant Maida's award from $2,000.00 per-month to $3,200.00 per-month. The Appellate Court prospective order is explicit:

> "ORDERED that the order is _modified,_ on the law and the facts, by increasing the award of maintenance _pendent lite_ from $1,400 per month to $2,000. Per month and the award of child support _pendent lite_ from $600. Per month to $1,200. Per month. As modified, the order is affirmed insofar as appealed from with costs to plaintiff."

80.     Paragraphs 1 through 79 and 80 hereof of this Complaint are re-alleged and incorporated by reference.

81.     Defendant Strauss, knowingly, recklessly, or culpably engaged in the scheme, artifice, or plan, in violation of the Federal Mail Fraud Statute, 18 U.S.C. 1341 (1982) and carried out the below-referenced scheme or artifice to defraud monies from Complainant. As a result of the tortuous conduct described below, defendants Strauss and Maida committed misrepresentation to conceal material facts and made misleading statements of fact to the Court.

82.     On December 15, 1986, Defendant Strauss, deposited in the U.S. Postal Service a letter to Complainant's then attorneys Bruce G. Behrins, Esq., and John Gussow, Esq., a copy of a hand delivered letter to Complainant's then place of business Bear Stearns & Co. Inc. Accompanied the letter to the firm was a recorded unwarranted "Income Execution for Support Enforcement" in the amount of $15,600.00. See, (Exhibit 130-132) in which defendant Strauss falsely claimed to the firm:

> "As you can tell from the form, the default derives from Nicholas E. Purpura's _failure and refusal to pay retroactive maintenance_ and child support as order by the  Appellate Division, Second Department, a copy of that Court's order is enclosed for your ready reference,"

83.     At no time did Complainant ever refuse to pay maintenance or child support. On advice of then counsel, Complainant was told that the Order issued was clearly a prospective Order and a modification, and no retroactive monies were due. Nowhere in the Order did the Appellate Division award retroactive monies to defendant Maida. By law, in the State of New York, if a Court had inadvertently failed to award retroactive monies, and defendants Strauss and Maida believed they were entitled to those monies, by law, defendants were required to reargue or renewal. No such action was taken be defendants.

84.     For two decades Complainant appeared before each level of the Court with timely

appeals/applications calling the Courts' and other state agencies' attention to Mr. Strauss's repeated acts of perjury and fraud, only to be ignored, without explanation or statement of legal reasoning. Complainant's motion for review pursuant to CPLR 5015, and by Court Order issued by the Administrative Justice for the Second Judicial District, dated June 30, 2003 gave defendant Strauss another opportunity to commit more fraud. In a continuance of the act of fraud, cited in paragraphs above defendant Strauss intentionally misled the Court by recklessly making false assertions in a sworn to affirmation and testimony. He presented materially false and misleading statements of fact set forth in his cross-motion and prior affirmations and represented unrelated case studies as if they were precedent in defense of his act of fraud. For example Strauss cited authorities *Dooley v. Dooley*, 128 AD2d, 513 NYS2d 167 (2nd Dept. 1987) and *Khalily v. Khalily*, 99 AD2d 482, 470 NYS2d 424 (2nd Dept. 1984) copies attached (Exhibit 133-5).

85.     Both cases cite and address statutory requirements of a Supreme Court to make temporary maintenance and child support retroactive effective as of the date of plaintiff's application. In the case at bar, Complaint had previously paid in excess of $1,200 a month in alimony and child support over a period of 16 months. At no time was Complainant in arrears. Defendant appealed, requesting an increase in temporary alimony. The authorities submitted by Strauss addressed errors made by a Trial Court, which had no relation whatsoever to retroactive monies of an upward modification made by the Appellate Division. If, for argument's sake, defendants truly believed they were entitled to retroactive monies, by law, they were required to submit a motion to reargue/ renew, not submit misleading case law misrepresenting the true facts surrounding the contents of said authorities. Clearly, neither case was of any moment to the issue at bar.

86.     In order to commit his fraud, defendant Strauss falsely represented to Complainant's employer that in their Order the "*court ordered retroactive monies*" to be paid to their client. And Strauss intentionally misrepresented the contents of the authorities to the Courts.*

*Note: Defendants Strauss, et, al., representing Defendant Maida demonstrate a propensity to deceive, repeatedly presenting material false and misleading statements as if they were factual testimony, at all times negligently omitting to state material facts necessary to make truth evident in light of the circumstances under which statements were made. This repeated negligence of

[32]

defendants, as alleged herein, was the direct and proximate cause of substantial damage to Complainant. This misbehavior is not an isolated incident. It is an on-going pattern of activity, Complainant will present 2 examples, Attached as one example is Exhibit 136-139, attachments to letter and other attachments forwarded to the Court on December 16, 1991,(Exhibit 112-3) by then Complainant's then attorney Ann L. Dietiere, Esq., [Complainant respectfully request this Honorable Court to read the entire letter, 9-para.. It speaks volumes pertaining to all Complainant's "Claims for Relief"] *See* paragraph 2:

> "*Mr. Strauss' explanation about the concealed portions of <u>Feldman v. Feldman</u> are patently unbelievable. I respectfully this Court take judicial notice of the fact that the material contained in the concealed portions were excised in the middle of two columns. it is difficult, if not impossible, to believe that a mere "clerk" could make a determination as to which portion of the case was even legally relevant, and go out of his way to cut the factual material from the case. As to the erroneous date of the case, how could a clerk someone more than a mere clerk would be able to find this case otherwise). <u>Enough is enough.</u>*

A second example has to do with a subpoena served on defendant Strauss to appear as a witness. Defendant Strauss's partner, defendant Elman, of the law firm of (defendants), Wachtel & Masyr, LLP appeared in Court in Staten Island before J.H.O. Sacks on March 9, 2004. At the time he gave testimony and submitted materially false and misleading factual statements set forth in a "memorandum of law," and omitted to state or represent the true facts surrounding the case study submitted as evidence. Following a long-winded dissertation on rules and regulations concerning the proper procedure that would mandate a witnesses' attendance, citing CPLR 2030 2 (a) and a 1964 case study submitted his 'memorandum of law" to the Court, *Chopak v. Marcus*, 22 AD2d 825, [defendant Elman intentionally omitting a pertinent section of that authority]. Most importantly omitted in the memorandum from the authority cited (See, *Chopak v. Marcus*, 22 AD2d 825, 255 NYS2d 277 was a phrase bold and underlined below:

> "*The plaintiff who is not an attorney and who appeared previa persona, is not a person authorized to issue a subpoena without a Court order and **<u>with the Courts permission</u>**,*"

Elman's Memorandum, *see*, (Exhibit 140-144) omitted the words "**<u>with the Court's permission</u>**":

> "*The plaintiff, who is not an attorney and who appeared <u>in propria persona</u>, is not a person authorized to issue a subpoena with a court order.*"

---

<u>Please Take Special Judicial Notice</u>: While the Complainant is/was no attorney, and while, technically, the Plaintiff may have used the wrong method to serve defendant Strauss, Complainant did, clearly have the Court's, J.H.O. Sacks's permission to serve him. Moreover, the Court record shows that the nature and grossness of defendant Strauss's criminal activity warranted the Court to assist, not block, this *pro se* litigate in his effort to subpoena defendant

[33]

Strauss, a Court officer. This same record shows J.H.O. Sacks bending over backwards to block, not assist, Complainant to execute his civil right to have Strauss testify. This is not the behavior of an honest judge seeking to reveal the truth and protect the integrity of the Court. It is the behavior of a criminal seeking to aid and abet another criminal, as a co-actor in an "*enterprise*," to hide the truth and to use the Court, under the "*color of law*," to protect a criminal from justified prosecution.

87.     At all times from the inception of this act of fraud, these predicated criminal acts referenced above occurred after the effective date of RICO  and within ten (10) of each other, defendant Strauss repeatedly continued to present false and misleading claims surrounding his misrepresentations to conceal material facts from the courts. In this instance cited above, the courts aided and abetted in this constructive fraud. Complainant exhausted his remedies in the court system in the State of New York on March 23, 2006. At no time was Strauss's fraud address in any decision and order in compliance with the legal requirements as outlined by the Circuit and Supreme Court of this United States. As a direct and proximate result of the foregoing conduct, Complainant has sustained monetary damages.

Please Take Judicial Notice: Complainant had appeared before Justices Sacks and Adams pursuant to CPLR 5015(a) dated June 30, 2003 (Exhibit 145) that addresses factors of "fraud, misrepresentation, or other misconduct" as a basis for relief from a judgment applicable to what either occurred prior to judgment or was a means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Since it has been alleged and proven that the discovered evidence would probably alter the judgment related to "fraud" specified in paragraphs above, whether extrinsic or intrinsic, Complainant has retained in the State provision words "*misrepresentation*" or other misconduct of an adverse party" appearing in the Federal provision. The Court has inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute. It is inherent! *See, Glade v. Allied Electric Products*, 135 F2d 590 7th Cir.)

The Court of Appeals for the state of New York held in *Crouse v. McVickar*, 207 N.Y. 213, 100 N.E. 697:

> "*A judgment based upon a fraudulent instrument, on the other hand, or perjured testimony, or any other item presented to an acted on by the Court, whatever it's  a fraudulent component, may be just an intrinsic fraud and hence vacatable only on direct attack.*"


FOURTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

Fourth Act of Fraud:
($3,356.09)

88.     Paragraphs 1 through 87 and 88 hereof of this Complaint are re-alleged and incorporated

by reference.

Note: The collusion among the actors, defendants Sacks, and Strauss, et, al. in this act of fraud has been on-going at different intervals throughout each proceeding within ten (10) years of each other. The evidence demonstrates that this alleged act of fraud, was before the Courts in 1991 through 1994, continued up to 2003, and as far as 2004. The Administrative Justice for the Second Judicial District Ann T. Pfau signed an Order on June 30, 2003 mandating adjudication of this same issue to determine whether pervious decisions should be vacated and a Summary judgment issued pursuant to the "*clean hands doctrine*" was warranted. This issue continued at the Appellate Division and Court of Appeals up until finalization dated March 23, 2006. In a violation of "*due process*" not a single Court Order exists to demonstrate that this issue (and those addressed above and below) were ever adjudicated within the dictates of existing law within the State of New York or any other jurisdiction within the United States.

Please Take Judicial Notice: At all times, throughout each "Claim for Relief" herein, above and below as a co-actor in the "*enterprise,*" Defendant Sacks, intentionally "*obstructed justice,*" ignored *material evidence,* issued *predetermined decisions* repeatedly denied Complainant "*due process.*" Complainant will present here a only a mere few examples of such judicial misconduct that are/were prevalent throughout each proceeding in which co-conspirator Sacks presided, (September 8, 1988 up until 2004):

Special Note: Complaint will only present certain pages, of the November 16, 2004 Trial Testimony, supported by the Cover-page 1 and certification page 89, (Exhibits 146-7) of the Court reporter in his Exhibit booklet due to the voluminous record. Complainant has requested this Honorable Court subpoena the entire record, before that too disappears.

(a) *Obstruction of justice,* Following 32 pages of misleading Trial testimony presented by defendant Strauss citing Sacks's infirm "*report*" and defendant Strauss's submission of his (perjurious) Cross-motion that supposedly addressed each act fraud listed above and below. Complainant attempted to refute Strauss's argument and present the true facts, to defendant Sacks. In a denial of Complainant's civil rights defendant Sacks put up every barrier possible to protect defendant Strauss. Below are two examples. See, Court transcript, Complainant quotes some of Sacks's statements:

(1) TT. page, 32, Exhibit 148, November 16, 2004, "***I will not listen to my* [his, Sacks's]** ***"report." I won't take argument on my report. You have already had it. I will not discuss it.***"

(2) TT page, 36, Exhibit 149, November 16, 2004, "***You're not going to examine him!***" [Strauss].

Defendant Sacks also refused to address 40-documentrary exhibits from the Court file that proved Strauss had committed fraud. Defendant Strauss submitted 13 citations of Orders in the record, falsely claiming that these citations proved that the issue of fraud, among others, had been previously argued and denied. Complainant presented proof that not a single citation presented had anything to do with the issue at bar. Yet, defendant Sacks, Adams, and numerous other jurists named herein, and in the Civil rights suit to be presented refused to address any material evidence presented by Complainant. The best description of defendant Sacks's behavior is described by a reporter for the *New York Post*, Philip Messing *see*, (Exhibit 65) This reporter *observed:*

(1) *"How Sacks (he looked half dead on the bench, by the way; anyone who spent 10 minutes watching him "work" would have known that something's not kosher in this case) consistently and repeatedly thwarted every attempt Purpura made to cross-examine Strauss about that very issue."*

(2) *"...the "court" system," as an entity, has only made a vague pretense of treating him fairly – and I'm disappointed my piece didn't more clearly reflect that determination."*

(3) *"How Purpura was denied any answers to his repeated claims as how Strauss was able to assert that the fraud issue had been previously addressed in 13 previous legal decisions, according to the court papers Strauss presented. (The alleged frauds post-date the cases cited by Strauss, so Purpura's claim that Strauss was being, at the very least, rater duplicitous in his arguments, has a degree of currency in my mind.)"*

On the record defendant Sacks proves that his, decision was <u>pre-determined</u>. *See*, TT. Page 44, March 9, 2004 (Exhibit 151). Sacks says:

<u>*"...I'm not going to reverse my decision..."*</u>

89.    The United States Supreme Court, in <u>*Monroe v. Pape*</u>. 81 S. Ct. at 476, 365 U.S. at 172, held:

> *"that an action under the "color of law" even when authorized by the state and is indeed prohibited by the state. Section 1983 reaches those "who carry a badge of authority of a State and represent it in capacity, whether they act in accordance    with their authority or misuse it." The S, Ct. refers to, <u>Lugar v. Edmondson Oil Co.</u>, 1982, 102 S. Ct. 2744, 2753, _ U.S. _, _, 73 L.Ed2 482."*

90.    This act of constructive fraud derives from defendant Strauss's and Maida's refusal to pay a required 50% of the cost of a joint appendix pertaining to an Appeal and Cross-appeal.

91.    Complainant was forced to pay an Appellate Printer $6,712.18. Defendant Strauss's reason for his refusal share in the costs as required by law was two-fold: (1) He intentionally refused to make payments anticipating that his refusal to pay would prevent Complainant the

[36]

ability to submit the appeal in a timely fashion. Strauss knew Complainant had only one-day for submission of briefs and appendix. Strauss anticipated that his refusal to pay the Appellate Printer would result in a failure/refusal of the Printer to submit the appeals in a timely fashion, thereby rendering Complainant's appeal abandoned, thereby covering up each act of fraud presented in Complainant's "First Claim for Relief." Strauss knew Complainant was running out of funds. To make Complainant's attempt to expose Strauss's fraud more difficult, defendant Strauss *unnecessarily demanded a full record*, refusing to submit by the appendix method... (*No need exists to elaborate concerning the appeal, to prove the constructive fraud presented herein.*)

Material Evidence before Every Court in the State of New York and
Irrefutable Proof of Deception, Misrepresentation Omission and Fraud:

92.     The Court rules are/were explicit, *see*, (Exhibit 153) Appellate Division, Second Department Rule 670.8 (c)(1):

> "*Unless otherwise ordered by the court, the parties shall consult and thereafter file a joint record or joint appendix which shall include a copy of the cross-notice of the equally by the parties.*"

93.     This act of constructive fraud began in 1991, continued through1993, and was repeatedly used by defendant Strauss before each level of the court system thereafter, throughout 1996-2004 in motion practices, ending in a final decision by the Court of Appeals on March 23, 2006. Each act continued within 10-years of each other. Defendant Strauss repeatedly made materially false and misleading factual statements set forth in detail in sworn to affirmations and Trial testimony, at all levels of the Court system. Most importantly, in defense of his act of fraud, in his "Cross-motion dated June 6, 2003, Exhibit 113, page 31, paragraphs 36, 37, and at a hearing under oath on November 16, 2004, in an act of pleading fraud, Strauss perjured himself saying:

> Appendix" in connection with the prosecution of an appeal from the Judgment of Divorce, as amended – all without success.

> The problem with Mr. Purpura's position is that there was no "Joint Appendix" – annexed hereto as pl. Exhibit 23 [Attached as Exhibit 154] are copies appeal

94.     Defendant Strauss intentionally misled the Courts about the true facts surrounding the Appendix, presenting the covers as if only the Complainant had appealed. To prove defendant

Strauss's intentional misrepresentation and outright pleading fraud, one only has to look at the exhibit to see, the Cover page, (Exhibit 154) Strauss's brief, lists defendants Strauss as Attorney

95.     Defendant Strauss repeatedly convicts himself of deceit, misrepresentation. *See*, Exhibit a wire faxed from the law firm of "Monasch & Strauss" and a signed letter by defendant Strauss, forwarded by the U.S. Postal service a letter, to Complainant's attorney Sidney Siller, Esq., saying:

> " *I have confirmed to Dick Baily Printers that Barbara Purpura will pay for one-half of the printing costs, and I believe that she has similarly confirmed her commitment directly with Dick Baily Printers;*";
>
> *Although you included none of my trial exhibits as part of the documents you submitted to Dick Baily Printer's for the joint record,…* " [Strauss unlined the word <u>Joint</u>, not Complainant]; (the rules are explict *see*, (Exhibit 153).

96.     A fax (Exhibit156) dated May 8, 1991 sent by Printer to Complainant's Attorney and Defendant Strauss, explains a printing error on the cover page of the Joint Appendix, saying:

> *"Please be advised that the Purpura v Purpura appeal printed as a appendix was understood it to be a Joint Appendix. However due to many last minute changes     the word Joint was not printed on the cover."*

97.     A fax forwarded to Printer (Exhibit 157) is a billing acknowledgement agreement signed and agreed to by defendant Maida, a/k/a Barbara Purpura, faxed returned to Printer by defendant Strauss. It indicates that 50% costs of the "full record" would be paid by defendant Strauss's client.

98.     A fax forwarded to defendant Maida (Exhibit 158) sent to Barbara Maida and her attorney requests payment for *"full record."*

99.     A fax forwarded by the Printer (Exhibit 159) was sent to Complainant's attorney on May 9, 1991. It was used as an exhibit at the Appellate Division, in which Complainant was forced to make an unnecessary application for the 50% of the joint appendix.

100.    The above *"material evidence"* conclusively proves *"beyond any reasonable doubt"* that defendant Strauss intentionally misrepresented fact, omitted, concealed, truth and repeatedly

perjured himself before the Trial Court and Appellate Court in order to commit and cover-up his constructive fraud due to a printing error. Strauss simply pointed to a cover page that inadvertently omitted the word "Joint" and falsely claimed that no joint appendix existed. Yet, the evidence conclusively proves to any reasonable person that this document was a "Joint appendix."

101.    The above-referenced predicated acts all occurred after the effective date of RICO (October 15, 1970) this predicated act of fraud occurred and within ten (10) years of each other. Each of the defendants' racketeering activities was undertaken for the purpose of furthering their common scheme or artifice to extort monies from Complainant.

102.    As alleged in greater detail above, acts in violation of Mail Fraud Statute, 178 U.S.C. 1341 (1982), enabled the defendants to carryout the above-referenced scheme or artifice to defraud monies from Complainant.

103.    As alleged in greater detail above, acts of wire fraud by defendants in violation of Federal Wire Fraud Statute, 18 U.S.C. 1343 (1982), were carried out by the above-referenced scheme to defraud monies from Complainant.

104.    As a direct and proximate result of the defendants' activities and conduct in violation of sections of 1962 of RICO statute. Complainant has been severely injured. Under the provisions of 1964 (c) of RICO, Complainant seeks to recover herein treble damages plus costs and reasonable attorneys fees.

Please take Special Judicial Notice: Complainant had appeared before Justices Sacks and Adams pursuant to CPLR 5015(a) dated 2003 that addresses factors of "fraud, misrepresentation, or other misconduct" as a basis for relief from a judgment applicable to what was either occurred prior to judgment or was a means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Since it was proven that the discovered evidence would probably alter the judgment, the "fraud" specified above whether extrinsic or intrinsic Complainant has retained in a State action related to the words "*misrepresentation*" or other misconduct of an adverse party," appearing in the Federal provision, have been retained in the State provision. The Court has inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute. It is inherent! *see, Glade v. Allied Electric Products*, 135 F2d 590 7th Cir.)

The Court of Appeals for the State of New York held in <u>Crouse v. McVickar</u>, 207 N.Y. 213, 100 N.E. 697:

> "*A judgment based upon a fraudulent instrument, on the other hand, or perjured testimony, or any other item presented to an acted on by the Court, whatever its fraudulent component, may be just an intrinsic fraud and hence vacatable only on direct attack.*

### FIFTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

<u>Fifth Act of Fraud:</u>
($150,000.00)

### STATEMENT OF FACT

105.   The Trial Court had no intention of addressing the fraud that took place or the directive of the Administrative Justice to adjudicate Complainant's applications pursuant to CPLR 5015 or 3212. Defendant J.H.O. Sacks gives proof of Complainant's claim when he said on the record March 9, 2004, page 44, (Exhibit 152) :

> "*I decided all that at the time. You've been to the Appellate Division with my decision. I'm not going to reverse my decision at that time. I don't know what your point is?*"

106.   Paragraphs 1 through 105 and 106 hereof, of this Complaint are re-alleged and incorporated by reference.

<u>Note</u>: Again, collusion among defendants Sacks, Adams, Strauss, Maida et, al., in this act of fraud has been on-going at different intervals throughout each proceeding <u>within ten (10) years of each other</u>. The evidence demonstrates this act of fraud was before the Trial Court beginning in 1985, up until 1991, continuing thereafter at the Appellate levels, reverted back to the Trial Court in 1994, and continued in 2003, and 2004. The Administrative Justice for the Second Judicial District Ann T. Pfau signed an Order on June 30, 2003 mandating adjudication of this same issue of predicated acts of fraud. Following the Trial Court this same issue was before the Appellate Division and Court of Appeals up until finalization dated March 23, 2006. In a violation of Complainant's "*due process*" civil rights <u>not a single Court Order from any Court in the State of New York or any other jurisdiction exists to demonstrate that this issue was addressed or adjudicated within the dictates of existing law.</u>

107.   Attached as Exhibits168 is the cover page of an Affirmation dated February 12, 1995, and pages 17 and 18, Exhibit 169-170) presented to the Courts by Complainant's than attorney, James O. Guy, Esq. This exhibit gives a background history showing "*beyond any reasonable*

*doubt*" that the original judgment, dated January 31, 1991, issued by defendant Sacks was procured by fraud. Also proven above, made *absence "subject-matter jurisdiction.*" Please refer to paragraphs 86 through 102 under the heading "Original Judgment Procured by Fraud" further proof is presented below!

Please take Judicial Notice: Complainant was before Sacks and Adams pursuant to CPLR 5015(a) that addresses factors of "fraud, misrepresentation, or other misconduct" as a basis for relief from a judgment applicable to what either occurred prior to judgment or was a means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Since it was alleged and proven that the discovered evidence would probably alter the judgment, related to "fraud" specified above whether extrinsic or intrinsic, Complainant has retained in the state action the words "*misrepresentation*" or other misconduct of an adverse party," appearing in the Federal provision. The Courts have inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute. It is inherent! *See, Glade v. Allied Electric Products*, 135 F2d 590 7th Cir.)

---

108.    Defendants knowingly, recklessly, or culpably engaged in a scheme of racketeering by repeated and concerted acts of conduct including, but not limited to (a) adopting a secret enterprise, artifice, or plan to defraud monies from Complainant by concealing legally joint marital assets, by misrepresentation, omission of fact, failure to disclose, agreed to and cooperated with defendant Maida. In connivance with defendants Maida, and Strauss concealed and secreted marital assets in excess of $150,000.00, which defendant Sacks refused to address perjurious affirmations that defendant Maida was without monies, and that she had submitted a false/misleading "Net Worth Statement" that omitted any mention of stock accounts in which she had a substantial financial interest.

109.    Irrefutable proof attached is a letter forwarded to the firm of Bear Stearns and Co. by defendant Maida requesting the removal of her name from joint stock accounts 30-days prior to filing for divorce. *See*, (Exhibit 160):

> "*Please be advised that Barbara's name is to be removed from the above-referenced accounts....*"

110.   At Trial Complainant's attorney questioned defendant Maida a/k/a Barbara Purpura, whether she had discussed the removal of name from said accounts, with her attorney, defendant Strauss. See, (Exhibit 161) TT page 19 lines 8-14:

> Q: *"Mrs. Purpura, had you already retained Jeffrey Strauss as your attorney when this letter was sent?*
> A: *Yes.*
> Q: *Did you discuss with your attorney the removal of your name from these accounts prior to sending the letter?*
> A: *I believe I did.*

111.   Defendants Maida and Strauss had been previously ordered to submit copies of all transactions in the accounts in which her name was removed, from 1983 up until 1985 when the parties had legally separated and commencement of the action in 1985 began.

112.   Instead, at the Trial, in an act of intentional omission and deceit, defendant Strauss submitted account statements subsequent to those ordered by the Court that misrepresented the amounts of monies in the accounts. Defendant Maida had already withdrawn the monies. Those submitted were for the period of *December 31, 1988 through June 30, 1989. See TT (pages 10-11). A review of the statements presented to the Court showed in one account* (Exhibit 164) *a total of $16.10, in the second account a total* (Exhibit 165) of *$171.37.*

113.   Complainant's attorney at Trial presented the Court copies of each account. One joint account showed, on September 30, 1983, a total amount of $23,218.54 (Exhibit 166); and the second joint account showed a market value of $225,344.00 Exhibit167. The Court had no interest in the disappearance of those monies. In connivance with defendants Strauss and Maida, J.H.O. Sacks ignored perjury and economic fault that in a Court of Equity would bar any distribution award.

114.   In 1995 [*within the 10-year period*] Complainant presented the Court with a copy of Maida's tax return (Exhibit 173-174) dated February 11, 1991. This return shows interest monies received in the amount of $5,265.00. in which defendant Strauss was questioned by Complainant's attorney about how, if defendant Maida had no monies, she could derive interest monies? Please refer to James O Guy, Esq., Affirmation (Exhibit 169), paragraph 92, I quote:

*"Mr. Strauss stated that Maida transferred assets out of her name and after the judgment was entered on September 13, 1990, she transferred the assets back to herself."*

115.   The statement in paragraph 114 above proves the entire judgment was predicated on fraud. Defendant Strauss was repeatedly misrepresenting truths to each Court (Supreme and Appellate) that his client's only income was received from alimony and child support. To quote, defendant Strauss:

*"She has no income other than the alimony income*

Proof of Economic Fraud and Repeatedly Perjury Ignored By The Courts:

116.   Defendants Strauss and Maida repeatedly claimed his client was without skills. In their Affidavits and Affirmations during Trial, they repeated this lie at the Appellate Division, intentionally and recklessly claiming, under oath, that defendant Maida was not "self-employed," and was without skills. See defendant Strauss's Affirmation, (brief) (Exhibit 171-172, pp 6-7).

117.   Complainant's attorney submitted defendant Maida's business cards (Exhibit 173) for her catering business [for concealment purposes Maida had *used her father's phone number on the cards*]. Her excuse at Trial for the deception was that listing her father's phone number was more convenient.

118.   Maida (a trained chef) was also a partner in a second business, a restaurant that, with another Chef, made specialty foods direct to their clients' homes in New York City with another Chef, Her partner called *"Fast and French."* See, menu, and business card (Exhibit 174).

119.   Complainant's attorney questioned defendant Maida on the witness stand about her business. *See* Trial Testimony. At this time Maida admitted that she had *"under-ground businesses"* throughout the divorce proceedings from 1983–1989. *See* Exhibits 175-8, pages 9-12. Strauss is telling the court, see, page 4, Purpura-motion Exhibit 179, *"She has no income other than alimony income"* Yet, the Trial Court (Sacks) and the Appellate Court ignored this same material evidence now before this Honorable Court. All of said misrepresentation and concealment was excluded from defendant Maida's *"Net Worth Statement."*

110.   Forwarded by mail, Defendant Strauss's prejurious Cross-motion (dated June 6, 2004) rebuttal to Complainant's proven allegations was: these arguments had been previously presented to the Trail Court (before defendant Sacks) and these same claims of *"concealment"* had been made by Mr. Purpura's counsel in the brief submitted to the Appellate Division in connection with the appeal of the Judgment of Divorce.  Strauss on page 32, (Exhibit 105) of his June 6, 2004 perjurious cross-motion as a defense claims :

> *"Principles of <u>res judicata</u> preclude consideration of these same claims of concealment for a third time on this motion."*

<u>Note</u>: For any action to be *res judicata* a party must prove that the issue at bar has been addressed and ruled upon. Strauss's repeatedly failed to present documentary proof, such as a citation in the record, to support his unfounded statement.

<u>Please take Judicial Notice</u>: 1) As a co-actors in an enterprise, defendant Sacks intentionally refused to address the evidence at the at the time of the original Trial. (2) The Appellate Court failed to address the evidence, failed to make a valid determination on the subject of *"concealment"* and fraud outlined above. (3) The Court of Appeals failed to address *"due process` and equal protection"* violations, basing their denial upon finality. (4) The purpose of Complainant's motion[s] pursuant to CPLR 3212 was to have these errors corrected.  The Administrative Justice Pfau on June 30, 2003, ordered the Trial Court to revisit the prior judgments and adjudicate to determine whether a *"Summary Judgment"* was warranted. (5) Sacks failed and refused to adhere to the Order; and, (5) Complainant submitted a motion pursuant to CPLR 5015 that required a full and fair hearing to ascertain whether the Court had erred in its first determination, which has yet to be adjudicated anywhere by a *"full and fair"* hearing. Vacating Judgments and Orders pursuant to CLR 5015, the counterpart of Rule 60(b),(3) of the Federal Rules of Civil Procedure, is a major component of the CPLR and civil practice.

The law is/was clear. As detailed affidavit, supported by the same exhibits referred to above irrefutably proved fraud, as required under CPLR 3016(b) and by law, defendants had to submit an affirmative reply supported by documentary evidence from the Court record. CPLR 3018(b) requires an affirmative defense. Defendant's made no affirmative defense.

111.   Defendant Strauss, being part of the *"enterprise"* knew he did not have to follow any rules or regulations. Hence he contemptuously told the Court in his Cross-motion *see,* page 33 paragraph 43 [(Exhibit 29]):

> *"I have consistently taken the position that I will not stoop to respond to his (Complainant's) attacks, as actionable as they may be, and I will take the same stance in responding to the motion now before the Court."*

Defendant Strauss used almost the same words to the Appellate Court:

> *"The Respondent-Appellant* [Complainant] *has made motions in this court and in the Court of Appeals in which he has impugned my integrity and professionalism as an attorney (as if such accusations would prompt the court to grant the relief sought. <u>I have not stooped to respond.</u>"*

112.    It is time for defendant Strauss's sophistry to end. By statute, a jury trial must be had on these issues. It is time for Defendant Strauss to start stooping! Complainant has overwhelmingly

<u>Please take Special   Judicial Notice</u>: Complainant had appeared before defendants Sacks and Adams pursuant to CPLR 5015(a) dated 2003 that addresses factors of "fraud, misrepresentation, or other misconduct" as a basis for relief from a judgment that are applicable to what either occurred prior to judgment or was a means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Complainant has retained in the State provision the words *"misrepresentation"* or other misconduct of an adverse party," appearing in the Federal provision. The Court has inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute, but is inherent! *see, <u>Glade v. Allied Electric Products</u>*, 135 F2d 590 7th Cir.)

The Court of Appeals for the state of New York held in *<u>Crouse v. McVickar</u>*, 207 N.Y. 213, 100 N.E. 697:

> *"A judgment based upon a fraudulent instrument, on the other hand, or perjured testimony, or any other item presented to an acted on by the Court, whatever it's a fraudulent component, may be just an intrinsic fraud and hence vacatable only on direct attack."*

*As demonstrated herein Complainant has yet to stop attacking!*

### SIXTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

#### Statement of Fact

<u>Sixth Act of Fraud</u>:
($22,100.50)

113.    This act of constructive fraud addresses unwarranted legal fees, costs, sanctions, based upon fraudulent testimony and exhibits submitted by defendants Strauss and Maida. The two jurists (defendants Adams and Sacks) recklessly issued *"reports"* and *"Orders"* that intentionally misrepresented the true facts surrounding each of their decisions. Each finding negligently omits material facts in order to aid and abet in "constructive" fraud. As part of the *"enterprise"*

defendants used the Court under the "*color of law*," to extort monies from Complainant and to their co-conspirators defendants Strauss and Maida.

114.   Paragraphs 1 through 113 and 114 hereof, of this Complaint are re-alleged and incorporated by reference.

115.   This claim for relief is also based upon intimidation made by players in the "*enterprise*" illegally to dissuade Complainant from protecting his civil rights through the legal process. Defendant Sacks and Adams, under the "*color of law*" repeatedly denied Complainant "*due process*" and "*equal protection*" Both jurists let it be known on the record that their decisions were pre-determined. Complainant quotes defendant Sacks from the Court transcript:

"<u>*I am not going to reverse my decisions…*</u>"

116.   To demonstrate the pattern of activity alleged, Complainant will first address defendant Sacks's infirm "*report*" and Acting Justice Rachel A. Adams's Order confirming said infirm "*report*." Both findings are intentionally based upon a false and misleading exhibit presented by defendant Strauss, who recklessly, and falsely claimed that each issue presented by Complainant had been previously adjudicated and denied at all levels of the Court system. Attached as Exhibit 182 is Strauss's exhibit, a list of 13 citations Orders:

<u>Please Take Special Judicial Notice</u>: A reporter for the *New York Post*, Philip Messing [*See*, Exhibit 65) observed:

(1) "*How Sacks (he looked half dead on the bench, by the way; anyone who spent 10 minutes watching him "work" would have known that something's not kosher in this case) consistently and repeatedly thwarted every attempt Purpura made to cross-examine Strauss about that very issue.*"

(2) "*…the "court" system," as an entity, has only made a vague pretense of treating him fairly – and I'm disappointed my piece didn't more clearly reflect that determination.*"
(3) "**How Purpura was denied any answers to his repeated claims as how Strauss was able to assert that the fraud issue had been previously addressed in 13 previous legal decisions, according to the court papers Strauss presented. (<u>The alleged frauds post-date the cases cited by Strauss</u>, so Purpura's claim that Strauss was being, at the very least, rater duplicitous in his arguments, has a degree of currency in my mind.**

???.   Complainant presented a complete copy of each the Orders issued by the Courts listed by citation in defendant Strauss's exhibit. See Exhibits 183-201 that defendant Sacks intentionally,

continuously, consistently, and repeatedly ignored this conclusive *"material evidence."* Instead, falsely said in his *"report"*:

Page 1 & 2; *"The record indicates that over 13 appeals have been heard and rejected. In all cases the original decisions have been essentially upheld."*

> *The defendant (Complainant) now comes before this court alleging five acts of fraud allegedly committed by the attorney for the plaintiff. These same issues have been previously argued and denied. He has appealed to the appellate division and upon denials attempted appeals to the Court of Appeals. This latter were summarily denied. (see Order of the Court of Appeals No. 688, Sept. 4, 2002).*

> Page 2; *The arguments presented by defendant* [Complainant] *have been thoroughly reviewed by all levels of the Court and found groundless. The defendant appears to and more amenable."*

Irrefutable Facts:

(1)     Not one of the citations presented by Strauss shows that any Court for the State of New York addressed a single act of fraud in question.

(2)     The Court of Appeals, decision No. 688, cited by defendant Sacks's in his infirm *"report"* is a figment of his imagination, no should **No such citation, Order, exists in the Court file**.

(3)     On June 30, 2003, Sacks was ordered by the Administrative Justice Ann T. Pfau of the Second Judicial District to adjudicate the matters before him. No Court in the State of New York or any other jurisdiction as of yet has addressed the five acts of fraud in a *"full and fair"* hearing. Nor does any Order exist in the Court file that makes reference to any of these acts of fraud!
117.     On page 3, of defendant Sacks's infirm "report" Sacks to aid and abet Strauss in his fraud, Sacks falsely claims;

> *"Whatever the situation, based upon the arguments presented and memorandum submitted, it is recommended that the motion to set aside all judgments pursuant to CPLR 3212 be denied as having been previously argued and denied."*

(1)     The Trial Transcript of the hearing on dated March 9, 2004 shows defendant Strauss was not present and his Cross-motion which was submitted through the mail, using the U.S. Postal Service.

(2)     At the hearing dated March 9, 2004, no reference was made to concerning Complainant's Motion for a *"Summary Judgment"* pursuant to CPLR 3212.

(3)     The Court record conclusively proves that only one *"Memorandum of Law"* was submitted (Complainant's) nor does the record show any other memorandum of law existing in

the Court file. It is important to note,, in his *"report"* in *dictum,* defendant Sacks said concerning Complainant's 'memorandum of law":

> *"One might conjecture that the defendant, appearing pro se, had some legal help  by   an attorney in preparing his motions and memorandum.... Nevertheless, one  must   take   notice  of  the  fact  that  the  memoranda  submitted  by  defendant  [Complainant]  are complete with citations of various cases and statutes allegedly supporting his position. The extensive research and availability of library facilities would certainly require a knowledgeable attorney"*

\*Note: Defendant Sacks's entire *"report"* is/was a distortion and misrepresentation of the true facts surrounding the issue. Complainant will also conclusively prove below, in reply to another "Claim for Relief," J.H.O. Sacks's intentionally distorted issues of the application and acted in connivance with co-defendants to sell Complainant's home void *"due process."* These entire proceedings were a fraud. Defendant Sacks made only a pretense in hearing the five acts of fraud illegally assigned to him by Acting Justice Adams. Sacks intentionally and recklessly combined issues in his report: (1) the original judgment; (2) the sale of Complainant's home; (3) he ignored the issue of credits, (failing to adjudicate any of them); and, (4) as far as Complainant's motion pursuant to CPLR 3212 defendant Sacks falsely claimed that the issue had been previously argued and adjudicated. In short, everything in his *"report"* is/was unsupported by the record and consisted of blatant lies.

Note: The collusion among defendants Strauss, Maida, Sacks and Adams et, al., in this act of fraud has been on-going at different intervals throughout each proceeding within ten (10) years of each other. The Administrative Justice for the Second Judicial District Ann T. Pfau signed an Order on June 30, 2003, mandating adjudication of this same issue of predicated fraud. The evidence demonstrates this act of fraud was before the Trial Court and Appellate levels, in 2003, and 2004, and, following the Court of Appeals up until finalization dated March 23, 2006.

118.    In a motion to "Reject" Sacks infirm "report" Complainant presented Justice Adams irrefutable evidence of the distortion and misrepresentation and concealment of material fact contained in the *"report."* Complainant proved beyond any reasonable doubt that defendant Strauss had perjured himself and had submitted a false and misleading exhibit that falsely claimed each of these acts of fraud had been previously adjudicated and denied.

119.    Complainant presented the Court with actual copies of each Court Order (Exhibits 183-201) listed in Strauss's false and misleading see Exhibits 182, that he had submitted to deceive the Court. Complainant proved that not a single act of fraud had ever been adjudicated.\* Yet,

Justice Adams, acting in concert, intentionally ignored the evidence and intentionally and recklessly based her decision and Order upon defendant Sacks infirm "*report.*"

*Note: Regardless of whether or not any of these issues had been previously heard, (which they were not!), Complainant's application pursuant to CPLR 5015 and CPLR 3212, by law, mandated review to see whether the Court had made an error in its previous judgment. By law, the Trial Court was mandated by statute and Court Order [issued by the Administrative Justice for the Second Judicial District] to adjudicate the matter within 60-days or the matter was to be returned to the Trial Court for an immediate Trial. Defendants Sacks and Adams violated both the statute and the Order.

120.   On September 30, 2004, Justice Adams issued her Order* (Exhibit 202-206) to confirm J.H.O. Sacks's "*report,*" recklessly failing and refusing to address the proof that the citations that defendant Strauss had listed and to which he had referred were erroneous. Complainant submitted complete copies of each Court Order listed by citation, proving Strauss's exhibit 182 was false and misleading. Yet, defendant Adams intentionally and recklessly reiterated defendant Sacks's lies though knowing Strauss's testimony and exhibit was false and misleading. With no justification, she aided and abetted, compounding the falsehoods, by saying:

> Page 2, "*The report of J.H.O. Sacks found that the allegations of fraud which defendant claims were committed by plaintiff's attorney are the exact same issues which have been previously been argued and found to be without merit, both by the trial Court and Appellate Courts. J.H.O. Sacks further recommends that defendant's motion to set 3212, not be granted as having been previously argued and denied....*

> Page 3, "*The Plaintiff concurs (Strauss-surprise) with the finding of J.H.O. Sacks that the arguments of Defendant had been heard and rejected at every level. In support of this Plaintiff provides in precise detail the history of this case by annexing the following: a list of motions heard by the court of appeals, a procedural history of this case, a recitation of the four appeals decided by the Appellate Division Second Department, a copy....*"

*Note: Defendant Adams's entire "Order" was a distortion and misrepresentation of the true facts surrounding the issue. In a separate, Seventh Claim for Relief below, Complainant will prove that defendant Adams's made this intentional, reckless, and vindictive distortion to mandate the illegal sale of Complainant's home. Like defendant Sacks, defendant Adams made only a pretense of "*administering justice,*" holding a charade hearing. Then, absent of "*subject-matter jurisdiction,*" she issued an Order that intentionally combined the sale of Complainant's home therein; intentionally, she ignored the issue of credits, failed to adjudicate that motion; and, as far as Complainant's motion pursuant to CPLR 3212, was concerned, she intentionally

ignored that defendant Sacks had falsely claimed that the issue had been previously argued and adjudicated. Everything in defendant Adams's "Order" and Sacks's "*report*" was unsupported lies.

121.   To further intentionally harm Complainant and unjustly enrich her co-conspirators, Strauss and Maida, in her infirm Order page 3 - 4, (Exhibit 204-205) Justice Adams says:

> "*This Court recognizes that J.H.O. Sacks failed to address the issue of attorney's fees and sanctions requested by Plaintiff in his June 6, 2003 cross-motion. Inasmuch as this issue was originally before J.H.O. sacks, the specific issue of sanctions and attorneys fees* hearing, November 16, 2004].

Hearing on Sanctions and Legal Fees:
($14,067.50)

122.   In a sham hearing, on November 16, 2004, defendant Sacks, intentionally "*obstructed justice,*" again refusing to address "*material evidence,*" intentionally and recklessly denied Complainant "*due process.*"

123.   To justify the unwarranted and illegal payment of legal fees, defendant Strauss reiterated defendant Sacks's entire "*report,*" on the record. The entire transcript is attached as Exhibits 207-295. On page 10, (216) Strauss says: "*I will briefly address those five discrete acts of fraud.*" In an attempt to protect defendant Strauss, J.H.O. Sacks interrupted saying: "*I sees no point into going into this (the fraud) .... It has been determined.*" (Exhibit 219) Strauss insisted, saying he needed to explain why he contended Complainant's actions were "*frivolous*" and justified ordering sanctions and legal fees. On page 22, (228) Strauss says: "*I am an officer of the court but to a certain extent I will be a witness now testifying ...*" (Strauss was sworn in and proceeded to perjure himself.)

124.   Following defendant Strauss's testimony, Complainant began to refute Strauss's testimony and the discrepancies in the "*report*" to prove that Strauss's had perjuriously misled the Court. On the record Sacks blatantly told Complainant, see page, 32, lines 22-24 (Exhibit 238):

> "*I will not listen to my report. I won't take argument on my report. You have already had it. I will not discuss it.*"

125.   Complainant had a legal right to cross-examined defendant Strauss, since: (1) Strauss perjured himself when testifying under oath; (2) his affirmation was perjurious; and, (3) the exhibit defendant Strauss presented to the Court and upon which the Court relied upon were false and misleading, alleging that these same matters were previously adjudicated. The verbal exchange between defendant Sacks and Complainant following Sacks's statement above proves that defendant Sacks was intentionally violating Complainant's civil rights (Exhibit 239):

Complainant:   *"Wait a minute, now, Your Honor, in all fairness Mr. Strauss cited
        your report. I would like to cite sentences in that report to refute
        some of the things that Mr. Strauss says. **Is this a one-sided
        courtroom again...? Please sir, we are here to sanction me.**

Sacks: **_That's right_**...."* [So much for *"due process"*].

126.   Complainant requested permission to cross-examine Strauss *see*, TT pp. 36, lines 2-3, (Exhibit 242) Sacks blatantly says:

                **_"You're not going to examine him!"_**

127.   Federal law [*see*, FRCP 56(d), concerning a Summary Judgment (which Sacks denied in his "report" and what these sanctions and legal fees are all about)] states:

    *"The court at the hearing of a motion by **examining the pleadings and the
    evidence before it and by interrogating counsel** shall, if practicable ascertain what
    material facts exist without substantial controversy."*

128.   On January 13, 2005, 4:13 P.M., defendant Sacks wired his *"report"* from his home thereby violating wire fraud statute 28 U.S.C. 1343. On the telephone; defendant Sacks told Complainant words to the effect, 'if Complainant did not like the *"report"* he should it appeal it."

129.   Defendant Sacks's *"report"* (Exhibit 296-7) [*procedurally untimely, made in absence of subject-matter jurisdiction. and unsupported supported by the record*] was dated January 5, 2005, In this *"report"* Sacks, again, makes the unsupported statement:

    *"This matter has been tried by several judges, heard in the appellate Division,
    application to the Court of appeals has been denied..."*

140.   Sacks went on to falsely say:

> *"In argument on November 16, 2004, on the question of imposition of sanctions   and legal fees to be awarded to plaintiff, the defendant has repeated and reiterated the same Argument arguments previously propounded and denied....*
>
> *The arguments presented by defendant have been denied time and again."*

141.   In conclusion, Complainant was sanctioned in the amount of $2,500.00 and illegally made to pay $11,567.50 in legal fees!

142.   Rationally indisputable is that Complainant had proved fraud occurred and defendants Sacks and Adams had intentionally *"obstructed of Justice,"* by aiding and abetting in co-defendants Strauss and Maida's fraud. Rationally irrefutable is that *"due process"* and *"equal protection"* were denied to Complainant through an orchestrated *"enterprise."*

143.   A continuous *"pattern of activity"* among defendants Strauss, Maida, Adams, and Sacks was to cooperate as an *"enterprise"* to impose sanctions and legal fees to intimidate Complainant from pursuing justice and defending his civil rights. On page 2 of defendant Sacks's *"report"* Exhibit 297, he unwittingly notes this intentional pattern of behavior. Sacks says:

> *hope he would desist from the continues conduct. This, however, has failed <u>to dissuade</u> the defendant."*

<u>Additional, Unwarranted Sanctions and Legal Fees:</u>
($8,133.00)

144.   On September 4, 2003, Complainant submitted a Show Cause Order to vacate all prior judgment. An issue was to be heard by defendant Sacks who refused to adjudicate the matter, but still lies about it in his May 13, 2004 *"report."* In a sham hearing, Justice Adams heard and decided the matter on October 30, 2003 and issued an order from the bench.

145.   Not by coincidence, on the same day defendant Sacks issued his infirm Order January 5, 2004, acting in connivance with Strauss and Sacks, defendant Adams had entered an Order (Exhibit 298-299). Basing her findings on a bench Order issued October 30, 2003 in which no written Order had been issued, failing to state any reason for the departure from public policy and prior precedent concerning the motion on the "Separation Agreement," and "invalid date chosen by defendant Sacks for division of assets in violation of the statute", saying:

"ORDERED *that defendant's (Complainant) motion be and the same hereby is*    denied *in all respects.*"

146.   By law, defendant Adams is/was required to articulate her reason for the departure from "public policy," "regulatory requirements," "statutes," "case law, and "precedent held by the Court of Appeals." Nor did she state why the doctrine of *laches* and judicial *estoppel* were inapplicable. By law, no legal justification existed for her to affirm defendant Sacks's prior Order that was clearly issued in absence of "**subject-matter jurisdiction**" to: (1) set aside the "*separation agreement*" and, (2) *chose an illegal date* of September 8, 1988 for distribution, in violation of the statute.   Defendant Adams's decision and Order clearly violated the "*equal protection clause*" and "*due process clause*" of the New York and United States Constitution.

147.   Federal Justice Richard Arnold *see, Anastasoff v. United States*, 233 F.3d 898. held:

> "*declared that unpublished opinions are not precedent and are unconstitutional because the framers, in speaking of "judicial power" in Article III, would have had in mind the common law courts of the time, **which consider themselves fully bound by their prior decisions**.*" [The *en banc* Circuit Court   vacated that panel ruling, but for unrelated reasons.)

148.   Jessie Allen, associated counsel at the Brennan Center for Justice at New York University School of Law, questioned whether opinions designated unpublished are truly rote applications of existing law, as asserted by most judicial commentators...

> "*No-citation courts in effect refuse to hear litigant's arguments that challenged judgment is inconsistent with court's rulings in other cases. Refusing to hear argument for consistent judicial treatment raises serious 'due process' concerns, especially given the strong association of consistency with fairness and   correctness in our legal culture.*"

149.   The Supreme Court of this United States (*see, Goldberg v. Kelly*, 397 U.S. 245, 271, 299) held:

> "*...that for a full and fair hearing to have occurred, the courts must demonstrate compliance with elementary legal rules of evidence, and must "**state reasons for their determination**" and, the courts must indicate what evidence was relied on.*"

The "*Unjust Sanctions*" and "*Legal Fees*" attached to the same above Motion.
(Judicial intimation)

150. On October 30, 2003, at oral argument, Justice Adams demonstrated her intentional vindictiveness and her participation in the ongoing enterprise to punish Complainant for his prior whistle-blowing. Defendant Strauss had requested, [*see*, October 30[th,] TT. (Exhibit 300-319), on page 12 (Exhibit 311)] Complainant be sanctioned for making a frivolous motion. In less than two hours defendant Adams claimed to have read the papers and issued a verbal bench order (*no written order was issued*). At which time defendant Adams threatened Complainant on the record see TT. page 17, Exhibit 316 and page 19, exhibit 318) saying:

> "*If you bring a similar application one more time, I will set this matter down for a hearing on sanctions.*"

151. The Supreme Court of this United States in <u>*Mathges v. Eldridge*</u>, 424 US 319 344, held:

> "*The rules "minimize substantively unfair treatment or mistake, deprivation by <u>enabling a person to contest the basis upon which a state proposes to deprive them of protected interest</u>.*"

> <u>*Cary v. Piphus*</u>, 435 US 259: "*Procedural due process rules are meant to protect persons not, from deprivation, <u>but to contest from the mistake</u> or justified deprivation of life, liberty or <u>property</u>.*"

<u>Pre-determined Sanctions and Legal Fees attached to the above Motion.</u>

152. In defiance of her threat, to protect against the illegal "*taking,*" of his home and monies and to preserve his civil rights, on December 15, 2003, Complainant submitted a Motion to Renew and/or Reargue based upon an irrefutable legal argument that he had previously presented in his [Complainant's] Affidavit that on the record, was ignored on October 30, 2004. Complainant supported his motion with: (1) *law of the case*; (2) *statutes*; (3) *precedent*; (4) *prior public policy*; and, (5) Constitutional protections violated by Adams.

153. On January, 15, 2004, defendant Strauss submitted a 3-page Opposition, saying Complainant had been previously warned he would be sanctioned. On January 21, 2004 despite a preponderance of evidence, in a *pre-determined* decision [*as will be shown*], Justice Adams, see Trial Transcript (Exhibits 320-334 ) ordered a hearing on sanctions on the same day against Complainant, to take place on February 19 & 20, 2004. A read of the transcript conclusively proves Complainant was legally correct in his entire argument. Defendant Strauss failed to appear for fear of being called to the witness stand in hi stacd, defendant Elman appeared,

[54]

quoting Adams that she would set a hearing down for sanctions if Complainant were to come before her again on the same issue.

154.    On February 17, 2004, 2-days prior to the hearing, Complainant submitted a letter to the Court, (Adams) requesting it become *"part of the official record"* [*see*, (Exhibit 336-339)], pointing to defendant Adams's previous unconstitutional and biased behavior on October 30, 2003 and January 21, 2004. Complainant pointed to her total disregard for statutes, case law, prior policy, on the issue of the *"separation agreement,"* and her failure to address the *"subject matter-jurisdiction"* question, or explain legally why the Appellate Court's prior Order dated October 14, 1986 was not the true, established *"law of the case."* [A question to date that has been intentionally left unanswered by every Court in New York State.]

Please take Special Judicial Notice: Complainant respectfully request this Honorable Court read the letter in its entirety. The facts included therein sum up Complainant's argument that, by law, is irrefutable and will prove beyond any reasonable doubt that defendant Adams had no interest in complying with the law. And was surely part of the *"enterprise"* that set out to intentionally and recklessly harm Complainant financially

155.    On April 15, 2004 (Exhibit 340-345), with reckless disregard for the truth, defendant Adams issued a 6-page, distorted, fabricated, dishonest interpretation of law and facts, ordering Complainant to pay legal fees in the amount of $7,133.00 and issuing sanctions against him in the amount of $1,000.00 for pursuing his civil right to stop an illegal *"taking."* Justice Adams:

   (1)    used Complainant's argument of the doctrine of *"law of the case"* and cited a subsequent Appellate Court Order, *Purpura v Purpura*, 193 A.D.2d 793, 598 N.Y.S. 2d 538 (issued in 1993) intentionally ignoring the prior Appellate Court decision dated October 14, 1986, that established the true *"law of the case,"*

   (2)    intentionally refused to address a *"subject matter jurisdiction"* question; with *express malice* intentionally ignored (1) prior policy, (2) case-law, (3) statutes, and (4) precedent established by the Court of Appeals;

   (3)    in an outright lie, falsely claimed Complainant's moving papers were devoid of any *"matter of fact or law allegedly overlooked or misapprehended by the court in determining the prior motion"*; failed to dispute the controlling question of what constituted a legal *"separation agreement,"* and *"contract law,"* previously found by the Court of Appeals to include numerous case law held as precedent by the same Appellate Court; and falsely claimed Complainant had submitted papers entirely without legal substance;

(5)      specifically, misapplied law and authorities; each of her findings were unsupported by the record. Indisputable is that defendant Sacks had acted in absent subject-matter jurisdiction when he usurped the Legislative intent of the statute in his choice of the valuation date. Adams, herself, on the record said on the record January 21, 2004 (Exhibit 333) that: *"commencement of the action"* was the proper date, incoherently recanting that finding at the next hearing;

(6)      recklessly misapplied the meaning and intent of what constitutes   *"frivolous conduct,"* citing authorities of no moment in the motion at bar. In short, this justice behaved like a common criminal she is; guilty of acting in concert with others named herein, the *"enterprise,"* that used the Court under the *"color of the law"* with criminal intent.

156.   Complainant appealed defendant Adams's January 5, 2004 and April 15, 2004 Orders to the Appellate Court, based upon proven violations of *"due process"* and *"equal protection."*

157.   Between 1986 and March of 2006, and at all times material to this Complaint, defendants named herein constituted an *"enterprise"* as defined in Title 18, United States Code, Section 1961 (4) to wit, a group of individuals associated in fact, to defraud Complainant.

158.   As a direct and proximate result of the defendants' activities and conduct in violation of sec. 1962(b) and (d) of RICO, Complainant has been injured; under the provisions of 1964 (c) of RICO, Complainant seeks to recover herein treble damages plus costs and reasonable attorneys fees

Please take Special Judicial Notice: Complainant had appeared before J.H.O. Sacks and Acting Justice Adams in 2003 pursuant to CPLR 5015(a) to addresses factors of "fraud, mistake, misrepresentation, or other misconduct" as a basis for relief from a judgment applicable to what either occurred prior to the judgment or as a means by which the judgment was obtained. CPLR 5015 is the counterpart of Rule 60(b)* of the Federal Rules of Civil Procedure. Since it has been proven that the discovered evidence would probably alter the judgment related to the "fraud, mistake, or misconduct" specified throughout each Claim for Relief herein, whether extrinsic or intrinsic, Complainant has retained in the State provision the words *"misrepresentation"* or other misconduct of an adverse party," appearing in the Federal provision. The Courts have inherent power to relieve a party from the operation of a judgment in the interest of substantial justice. This power does not depend on any statute. It is inherent! *see, Glade v. Allied Electric Products*, 135 F2d 590 7th Cir.)

The Court of Appeals for the state of New York held in *Crouse v. McVickar*, 207 N.Y. 213, 100 N.E. 697:

"A judgment based upon a fraudulent instrument, on the other hand, or perjured testimony, or any other item presented to an acted on by the Court, whatever its a

[56]

*fraudulent component, ,may be just an intrinsic fraud and hence vacatable only on direct attack.*"

## SEVENTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*
*(In absence of Subject-Matter Jurisdiction)*

### Statement of Fact

<u>Seventh Claim Fraud:</u>
($1,105,765.00)

159.    This claim for relief addresses the forced fraudulent sale of Complainant's home by the "*enterprise*" absent "*subject-matter jurisdiction*" and void "*due process*" as a result of the tortuous conduct described below by the defendants who intentionally and recklessly committed false misrepresentations to conceal material facts and thus have committed and/or aided and abetted in the commission of constructive fraud.

160.    As a result of defendants' constructive fraud, Complainant has sustained severe damages. Defendants further should be required to disgorge the gain which they have unjustly obtained at the expense of Complainant.

161.    Defendants' Adams and Sacks, in connivance with defendants Strauss and Maida recklessly issued "*reports*" and "*orders*" that intentionally misrepresented true statements of fact surrounding each of their decisions. Their findings negligently omitted material facts in order to aid and abet in "*constructive*" fraud. As part of the "*enterprise*" defendants Sacks and Adams recklessly used the Court under the "*color of law*" to extort monies from Complainant to aid their co-conspirators, defendants Strauss and Maida to commit and cover up fraud.

162.    Paragraphs 1 through 161 and 162 hereof, of this Complaint are re-alleged and incorporated by reference.

<u>Proof of Collusion</u> (Sacks and Adams):

163.    Defendant Sacks's intentional presentation of materially false and misleading statements of fact set forth in detail among others, and negligent failure to state material facts necessary in

order to make the statements true, in light of the circumstances under which they were made, is evident on page 1 of his *"report."* For example, in the first paragraph, of his *"report'* (Exhibit 346) Sacks says:

> *"This matter has been duly referred by Hon. Justice Rachel Adams to hear and report on a motion made by defendant to set aside all judgments heretofore issued in this matter and for a summary judgment. <u>To also report on the cross-motion of the defendant to compel the sale of certain properties.</u>"*

And on page 3, (Exhibit348) Sacks falsely embellishes on the above lie saying:

> *"The cross-motion of the plaintiff to compel immediate sale of two properties owned by the parties should be granted. The judgment of divorce entered on September 14, 1990 required the sale of said properties."*

164.  Acting in concert, defendant Adams based her Order upon Sacks infirm *"report"* and materially false and misleading statements of fact set forth in detail among others, and negligently omitted to state material facts necessary in order to make the statements true in light of the circumstances under which they <u>were made. For example, on page 1, in the first paragraph, of her September 30, 2004 *"Order"*</u> (Exhibit 202) that confirmed the above *"report,"* Adams, intentionally ignoring the issue at bar, misleadingly says:

> *"The cross-motion by plaintiff (Defendant Maida & Strauss) seek an order, pursuant 4403, confirming that the same Report; directing the immediate sale of the two properties owned by the parties; requesting attorneys' fees for the motion decided by J.H.O.; and requesting sanctions for this motion. ..."*

Page 2 (Exhibit 203 & page 3 (Exhibit 204):

> *"Additionally, J.H.O. Sacks recommends the granting of the cross-motion by Plaintiff to compel the sale of the two properties owned by the parties in accordance with the judgment for Divorce entered on September 14, 1990 which require the sale of said properties...."*

> *"The defendant argues that the "report" demonstrates that J.H.O. Sacks "ignored the statutes as enumerated in the C.P.L.R." refused to acknowledge evidence or address a single issue at bar, "overstepped the bounds of his legal jurisdiction" and illegally ruled on issues not yet heard or before the court" (see pg.2 Defendant's affidavit in support). In fact, defendant essentially posits the very same arguments that he has made in almost fourteen years of litigation. The Plaintiff concurs with the findings of J.H.O. Sacks that the arguments of defendant had been heard and rejected at every level. In support of this plaintiff provides in precise detail the history of this case by annexing the following: a list of motions heard by the Court of Appeals, a procedural history of this*

*case ,are citation of the four appeals decided by the Appellate Division, Second Department...."*

Undisputable Fact That Sacks and Adams Intentionally Lied:

(a)    A copy of Strauss's affirmation, dated June 6, 2003 (Exhibit 19), perjuriously addresses only the five alleged acts of fraud. Nowhere in said cross-motion is any mention of the properties or a request for an order mandating the immediate sale of said properties.

(b)    Complainant had presented Sacks with a separate motion. Sacks had been ordered by the Administrative Justice on June 30, 2003, to address the question of said properties. The questions at bar, that Adams and Sacks refused to address, were whether, Sacks, by law, had *"subject-matter jurisdiction"* to address these property questions, Whether the *"valuation date"* Sacks had originally set had *violated the statute*, and whether the court had failed to address mandatory *"credits"* mandated by statute, by a "full and fair" hearing. Both defendants' Sacks and Adams intentionally ignored said applications in a denial of Complainant's *"due process"* rights, refused to adjudicate these issues and ruled by judicial fiat.

(c)    Strauss submitted a false and misleading exhibit that listed cases addressed by the Trial Court, Appellate Division, and Court of Appeals. Not a single citation presented on that list demonstrated that the issue of whether Sacks had *"subject-matter jurisdiction"* had ever been addressed concerning Complainant's properties or whether the date for distribution of marital assets was valid. Nor did any Court address the question of whether Sacks had illegally ruled on an issue that was *res judicata*, that had previously been before the Appellate Division that established law of the case in 1986.

(e)    A copy of the March 9, 2003 Court transcript supports Complainant's argument that no adjudication had taken place at that hearing, is verified by the  Court Transcript regarding the *"sale of the properties"*:

        1) Sacks had failed/refused to adjudicate the application before him to set aside all previous motions based upon the *"separation agreement."* Nor were the applications concerning *"credits"* or the *"Summary judgment"* adjudicated, in-of-itself a denial      of      Complainant's *"due process"* rights;
        2) The record also shows that no cross-motion was ever forwarded before Sacks compelled the *"sale of the properties."* Nor does the record show the issue was heard or argued previously by either J.H.O. Sacks or Acting Justice Adams.

        3) The record shows Adams forwarded to Sacks one Cross-motion (Exhibit 71-110). That cross-motion requested sanctions and legal fees, alleging frivolous conduct related to the *"five acts of fraud,"* in which defendant Strauss had perjured himself by making the unsupported false claim that this same issue had been previously heard and denied.

165.    Most importantly, Sacks misleadingly claimed in his May 13, 2004 *"report"* page 1, (Exhibit 346) :

> "a judgment of divorce was entered herein in September 1990. The defendant has been
> contesting that judgment since that date. There have been numerous appeals from
> decisions of various judges in motions made by defendant. The record appears to indicate
> that over 13 appeals have been herd and rejected. In all cases the original decisions have
> been essentially upheld."

Facts:  True, Complainant has/had contested the judgment. But, the fact remains that, to date, no
Court record or citation demonstrates the questions of "*subject-matter jurisdiction*" *or the invalid
date chosen for distribution* were ever addressed by any Court in the State of New York!
Complainant's civil right to a "*full and fair*" hearing was denied violating Complainant's "*due
process*" and "*equal protection.*"

Also, the issue before Sacks was a Motion that required him to address "*Five Predicated Acts of
Fraud.*" As proven above, defendant Strauss defense was to submitted a list of 13-citations
(appeals), having nothing whatsoever to do with the issue at bar to deceive the Court. Again, not
a single citation had anything whatsoever to do with the "*five acts of fraud,*" "*credits*" or
"*Judgment of Divorce.*" The law mandated the  issue of fraud be adjudicated by the Trial Court.
The sham hearing over which Sacks presided on March 9, 2004, was suppose to address the issue
of fraud. At that time Sacks intentionally "*obstructed justice*" by denying Complainant "*due
process*" and admitted on the record his decision had been pre-determined!

Complainant Void "*Due Process*" was Forced to pay $1,105,765.00:
(*In Absence of Subject-matter Jurisdiction*)

166.    On behalf of the firm of Wachtel and Masyr, Strauss subsequently threatened that he and

his firm would immediately have the Sherriff s sell Complainant's home. To protect his home

from being sold on the open market void proper "*due process,*" Complainant was forced to enter

into a forced "Stipulation" (Exhibit 50) prior a final decision on the pending appeal. As proven

throughout this Complaint, co-conspirators Adams and Sacks repeatedly cooperated to deny

Complainant his "*due process*" and "*equal protection*" rights. Defendant Strauss and Maida

forced Complainant to pay the 50% of an inflated value on his home, on a hypothetical sale price

$2,200,000.00 gross, plus transfer taxes of $5,765.00 on June 14, 2005.

Please Take Special Judicial Notice: Not to burden the Court Complainant will give a short
explanation of what transpired following the stipulation:

    1).    The Court illegally refused to address in excess of a $1,000,000.00 in expenses to
Complainant in conjunction with the illegal sale of his home. At no time did the Appellate
Division or the Court of Appeals address the issues listed above that the Trial Court had
failed/refused to address. On Appeal before the Appellate Division, the Court refused to address
any issue presented by Complainant. The Court intentionally ignored Black Letter law to dispose

of the matter, On October 5, 2005, Justices Cozier, Ritter, Spolzino and Lunn [Docket No. 2005-00878] issued the following Order (Exhibit 350). That in pertinent part said:

> "*ORDERED that on the court's own motion, the appeal is dismissed as academic in light of the parties' stipulation dated June 14, 2005, and the decision and order of this court dated August 24, 2005, in Purpura v Purpura, (Appellate division docket No. 2004-09844) determining an appeal from an order of the same court dated September 30, 2004;.."*

    2).    The legal problem with this Court Order is that it clearly denied Complainant of his "*due process*" rights. Both the Trial Court and Appellate Division intentionally refused to address documentary "*material evidence*" and exhibited arbitrary, capricious, and invidious treatment of Complainant and "*malicious abuse of legal process.*" By law, Complainant had a statutory legal right to "*credits.*" Complainant had previously noticed for appeal <u>prior to the signing the stipulation</u>. The stipulation (Exhibit 351-353) was acknowledged. In the "*rider*" see, page 3, Exhibit 353, the parties specifically stipulated to protect Complainant's right to "*credits,*" pending the upcoming appeal. The stipulation specifically stated:

> "*It is understood between the parties that defendant (Plaintiff in this action) Nicholas E. Purpura, is complying with the seventh decretal paragraph of the judgment in accordance with the March 18, 2005 sworn Affidavit. In said affidavit he agreed fully to comply with the September 13, 1990 (judgment) that stated: "if I were not to prevail at the Appellate level though existing appeals are pending." <u>It is understood that the issues still outstanding will be settled in a Court of law. It is also understood that Nicholas E. Purpura reserved all his</u> rights to these monies and property, and will continue to pursue the appeals <u>outstanding.</u>*" [So much for the stipulation].

    3).    To make matters worse, in denial of Complainant's "*due process*" *the decision and order of this same court dated August 24, 2005*" (Exhibit 354-355) had no basis in law, since, by law, **that pervious tribunal acted in clear absence of "*subject matter jurisdiction*"** to address or rule upon the issue of "*credits*" or the "*residence.*" **Those issues were not on appeal or in contention before that tribunal**! The Court's action was deliberate interference by an enterprise with Complainant's civil right to procedural "*due process.*"

    4).    The referenced Order, dated August 24, 2005 (Exhibit 354-355)), Appellate Division, Second Department [Docket No. 2004-09844] affirmed a prior decision of Acting Justice, Rachel A. Adams, on a completely different issue having nothing whatsoever to do with parties' residences. The Appellate Tribunal's last sentence of its decision Order **violated "subject matter-jurisdiction"** saying:

> <u>*Reconsideration of issues regarding the sale of the residences is similarly precluded.*</u>"

<u>Please Take Special Judicial Notice</u>: concerning <u>both</u> vindictive findings by the Appellate Division, (October 5, 2005, [Docket No. 2005-00878] Exhibit 350, & August 24, 2005 [Docket No. 2004-09844, Exhibit 354-355]) *see, <u>Milliken v. Meyer</u>,* 311 U.S. 467; *<u>Grannies v. Ordean</u>,* U.S. 385; *<u>Priest v. Las Vegas</u>,* 232 U.S.604; *<u>Roller v. Holly,</u>* 176 U.S. 398,:

"*An elementary and fundamental requirement of due process in any proceeding    which is accorded finality is notice reasonably calculated, under all the    circumstances,    to    apprise interested parties of the pendency of the action and  afford  them an opportunity to present their objections.*

167.   Simply put: (1) Each decision failed to address a single issue on review. (2) No cross-motion concerning the "*separation agreement*" or "*credits*" was presented by defendant Strauss; nor did the Court consider whether the ordered sale was illegal, since it was issued by judicial fiat **in absence of "*subject matter adjudication.*"** Defendant Sacks's refused to adjudicate Complainant's residence, violated "*due process.*" (3) Defendant Sacks's intentionally issued a false and misleading "*report,*" saying each issue had been "*thoroughly reviewed by all levels of the court and found groundless,*" that was unsupported by any record, and was an outright lie! Complainant had repeatedly presented this same conclusive proof to each level of the Court system of the State of New York, each of which repeatedly has ignored conclusive evidence to the contrary. (4) Complainant has repeatedly argued that, for decades, at each level of the Court in the State that intentionally acting in concert, ignored the "*doctrine of law of the case.*" Neither, Sacks, Adams, nor any Appellate Tribunal thereafter had "*subject matter jurisdiction*" to invalidate or set aside the legal "*separation agreement*" previously found by a prior Appellate Court dated October 14, 1986. **That prior Order rendered the issue *res judicata*.** Each subsequent decision thereafter violated precedent set by the States' highest Court and Legislative intent of the statutes. Yet, in each subsequent decision, each Court Complainant appeared before intentionally remained silent concerning the 1986 decision that established the "*separation agreement*" as "*law of the case.*"

168.   Clearly the August 24, 2005 Tribunal "*lacked subject matter jurisdiction*" to address the issue of the residences, **since it was not an issue before the court**; (1) Only a notice of appeal concerning "*credits*" had been filed. (2) No papers had yet been submitted! Again, previously, in a denial of "*due process,*" Defendants Sacks and Adams themselves refused to adjudicate the issue in defiance of a higher Court Order dated June 30, 2003. Defendants' intentional denial of "*due process*" allowed for another illegal "*taking*" of Complainant's assets and, (3) the Trial Court's (Adams & Sacks) refusal to address the "*separation agreement*" in a "*full and fair*" hearing was an act of "intentional malice" since no legal argument existed by law to set aside Complainant's "*separation agreement.*"

169.   The Trial Court and Appellate Tribunal <u>knew</u> or should have known by the evidence presented, that their Order would illegally aid and abet in *"unjust enrichment."* By law, Maida was <u>not entitled</u> to 50% of Complainant's home! By refusing to hear the Motion on *"credits"* <u>that had been ordered twice,</u> (first by the Administrative Justice Pfau, on June 30, 2003 followed by Supreme Court Justice Aliotta, See Order dated September 10, 2004 (Exhibit 356-357). Defendants Sacks and Adams "intentionally," with reckless malice allowed Defendants Strauss and Maida to double dip in excess of a million dollars void *"due process."*

Note:  "The fundamental requisite of *"due process of law"* is the opportunity to be heard." See, <u>Grannis v. Ordean</u>, 234 U.S. 385, 394

Please Take Judicial Notice: The unconstitutional behavior of every jurist involved in this case (outside of Sangiorgio Merrero, Sunshine and Aliotta) is now subject of a civil rights suit pursuant to Article III, Section 2, which extends the jurisdiction to cases arising under the U.S. Constitution pursuant to Title 42 U.S.C. 1983, for violations of certain protections guaranteed by the Fifth, and Fourteenth Amendments of the Federal Code. Under the *"color of the law"* as individuals and in their official capacity, associated as agents, working for agencies of the New York, these jurists repeatedly applied contradictory reasoning based upon misapplication of existing law as if their reasoning were evident. These jurists acted in concert in a enterprise and are guilty of premeditated "malicious abuse of legal process" with "express malice" as punishment for Complainant's prior whistle-blowing.

*See*, add constitutional cases- pull <u>Capital Elec. Co. v.  Cristaldi D.C.Md.</u>, 157.F.Supp 646, 648 and <u>Sparf v U.S.</u> ,156 us 51, 15 S. Ct. 273, 39 L. Ed.

170.   Each Decisions and Order rendered was unsupported by evidence to justify the findings. The Supreme Court, *see* <u>Goldberg v. Kelly</u>, 397 U.S. 245, 271, 299, held:

> *"...that for a full and fair hearing to have occurred, the courts must demonstrate compliance with elementary legal rules of evidence, and must "state reasons for their determination" and, the courts must indicate what evidence was relied on."*

171.   Throughout Complainant's protracted litigation not a single hearing <u>took place</u> concerning the illegal *"taking"* of Complainant's residence. The notion of *"due process"* is not an academic abstraction. It is rooted in long tradition of Anglo-American jurisprudence. Due process should safeguard, at least in theory, individuals from confiscation or forced to settle claims through the judicial process. The Supreme Court of this United States had this to say concerning a *"taking,"* *see*, <u>Brodie v. Connecticut</u>, S.Ct. 780, 401 U.S. 371 (1971):

> "*That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid government interest is at stake that justifies postponing the hearing until after the event.*"

172.   As a direct and proximate result of defendants' activates and conduct in violation of 1962 RICO, Complainant has been severely injured in his business and property. Under the provisions of s1964(c) of RICO, Complainant seeks to recover herein treble damages and the cost of bringing this action, including reasonable attorneys' fees.

### EIGHTH CLAIM FOR RELIEF
Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

### Statement of Fact

Eighth Claim Fraud:
($453,234.89) plus

173.   Paragraphs 1 through 172 and 173 hereof, of this Complaint are re-alleged and incorporated by reference.

174.   On or about July 15, 1986, defendants Strauss and Maida moved for an order to show cause to restrain Complainant's use any of his funds for the sale of stock [though a prior lien existed on said stock]. The purpose of the filed order to Show Cause was to induce Complainant to capitulate. Defendant Strauss knowingly submitted papers that misrepresented and concealed material facts from the Court which were induced to injure, and did, injure Complainant.

175.   As a result of Strauss's false statements and misrepresentations, Justice Norman Felig issued an order dated November 6, 1986 (Exhibit 358-360) restraining Complainant selling any stock, and, if any stock was sold 50% of the sale was to be held in escrow.

176.   As a result, Felig issued injunction which had prohibited Complainant from using his funds. Intentionally omitted was the fact that, prior to commencement of the divorce action, a first lien had been placed upon said stock by the U.S. Trust Company to cover joint obligations of the parties, i.e. mortgages on both residences and joint marital debts. When said common stock was sold by Bear Stearns and Co., U.S. Trust Company received the entire amount of the

[64]

proceeds. A copy of said payments are reflected in defendant Strauss's ex. 123 (Exhibit 361) proving Complainant never violated any Court order nor did he receive a cent of the sales of common stock. Also see a copy of the sales sheet, defendant Strauss's ex. 94. (Exhibit 62).

Please Take Special Judicial Notice: Throughout these entire proceedings each and every affirmation presented in each application and appeal up until 2005, defendant Strauss perjured himself concerning the U.S. Trust Company lien on the stock, at all times falsely claiming Complainant had *"pocketed the monies,"* knowingly committing misrepresentations to conceal *"material facts"* from all three levels of Court. Though knowing the truth, defendant Strauss falsely said the following. Example, see June 6, 2005 Cross-motion (almost 20-years after 1986!) *see*, page 26, 27, (Exhibits 98-99):

> *"…It appears that he [Complainant] is of the view that the use of September 7, 1988 as the valuation date meant that he was free to sell more than $1,000,000. of marital property during the pendency of the action and retain those sales proceeds exclusively for himself,…"* \*

> *"Sight should not be lost of the fact that Mr. Purpura made those stock sales in violation of orders granted by justice Felig (requiring that 50% of any sales during the pendency of the action be escrowed, which they were not) and J.H.O.   Sacks   (which prohibited stock sales altogether).*

177. Complainant respectfully requests this Court refer to Exhibit 112, a letter dated 1991, page 1, par. 4, *[please read the entire letter]*; to the Court by Complainant's then attorney Ann L. Detiere, Esq., requesting sanctions against defendant Strauss for his repeated misrepresentations:

> *"Mr. Strauss's misrepresentations are not so limited. Mr. Strauss continues to insist that Mr. Purpura violated Justice Felig's order, when he is fully aware that the U.S. Trust Co. had a prior lien on the stock."*

178. At all times defendant Strauss knew that a prior U.S. Trust Company lien existed and the U.S. Trust Company had received the money from the sale of the stock. See, list of stock sales submitted by defendants' Strauss and Maida. Their ex. 94 submitted at trial (Exhibit 361) showed Complainant had never received any monies from the sale of common stock. Strauss was well aware that Complainant never received any moneys, at Trial Complainant was questioned by Strauss see TT Exhibit 362, exhibit speaks for itself.

179. Strauss repeatedly perjured himself before all three Courts about these stock sales. knowingly misled the Courts, his prior affirmation confirmed that, before any restraining Order

existed, the prior lien was in place, prior to commencement of the divorce action [July 2, 1985]. I quote from defendant Strauss's affirmation:

> "that the annexed copy (exhibit 9) an exhibit of that certain Modification, Consolidation borrow, and Citibank N.A. as lender, pursuant to which a single mortgage lien in the amount of $620,000. was created through the combination and consolidation of mortgages mentioned in Items 11, 14, and 15, genuine and authentic."

180.   In furtherance of their scheme financially to harm Complainant, defendant Strauss moved for an order to show cause in 1988, before J.H.O. Sacks, to totally restrain Complainant's use of any funds. Strauss filed an unnecessary order to show cause to induce Complainant to capitulate. Defendant Strauss knowingly submitted papers that misrepresented and intentionally concealed material fact from the Court to harass, injure, and create additional legal fees for himself and his law firm. Clearly, the record and exhibits attached above prove that no stock that was subject to martial distribution was sold.

181.   Strauss instituted that show cause order to harass and destroy Complainant's new business. Based upon defendant Strauss's misleading application, on August 4, 1988 defendant Sacks, acting in concert with Strauss, vindictively issued an Order See Sacks Order, dated August 8, 1988 Exhibit 363 that entirely denied Complainant any use of his funds. Defendants Strauss and Maida, successfully blocked Complainant from use of his funds. Said "Order" caused Wings Publications Ltd. d/b/a The Staten Island Eagle to cease from continuing to operate. Unable to print, or pay staff, Complainant was forced to close his newspaper business following 28-months of doing business without any financial compensation. Attached is a copy of monies previously loaned to Wings Publications (Exhibit 364) in which Complainant lost $392,196.87. This figure is supported by defendant Strauss own exhibit submitted at trial, see Exhibit 365.

182.   This claim for relief results from tortuous conduct described above. With malice defendants Maida, Strauss, and Sacks intentionally and recklessly made misrepresentations to conceal material facts and thus aided and abetted in additional loss to Complainant of $392,196.87, plus due to the unnecessary shutdown of Complainant's newspaper. In addition, Complainant was unable to collected outstanding debt due Wings Publication by advertisers in

the sum [see, accounting sheet, (Exhibit 59)] of $61,038.02, total $453,234.89 in monies unnecessarily lost.

183.   Defendants' Strauss and Maida acted in connivance with, defendant Sacks who recklessly issued his "*order*" on August 1988. As part of the "*enterprise*" defendant Sacks recklessly used the Court under the "*color of law*" to aid co-conspirators, defendants Strauss and Maida.

184.   As a direct and proximate result of defendants activates and conduct in violation of 1962 of RICO, Complainant has been severely injured economically in his business and property. Under the provisions of s1964(c) of RICO, Complainant seeks to recover herein treble damages and the cost of bringing this action, including reasonable attorneys' fees.

NINTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*
(Absent Subject-Matter Jurisdiction on a Matter *Res judicata*)

Statement of Fact

Ninth Claim Fraud:
($240,000.00, May, 10, 2002, plus monies $84,885.00
the Department of Finance on May 16, 1997) Plus.

185.   Based upon fraudulent and misleading Affirmations and pleadings submitted by Defendants Strauss and Maida, they were able to obtain a Court Order awarding statutory interest on monies they had fraudulently obtained void any "*full and fair*" hearing. This was made possible with the assistance of defendant **Sacks who intentionally and recklessly ruled upon a matter that was clearly *res judicata,* in absence of <u>subject-matter jurisdiction</u>.** Concerning this matter, defendant Sacks intentionally ignored and violated the Legislative intent of the statutes as outlined in the CPLR. What makes this act of fraud more glaring, the Courts allowed defendants Maida and Strauss to enforce a "*Homestead Order*" in blatant violation of rule of law. The unprecedented illegal actions of jurists Sacks, Adams, et al., will be dealt with in a separate suit. Complainant for the purpose of this Claim for Relief will demonstrate how these jurists acting in concert as part of the "*enterprise,*" compounded the previous acts of fraud, that unnecessarily cost Complainant in excess of $180,000.00. [the total interest was taken in the

[67]

amount exceeded $300,000.00]. What cannot be denied, and will be proven *"beyond any reasonable doubt"*, is that Complainant was a victim of *a judicial con-game* and was clearly denied *"equal protection"* due in part to violations of rules of procedure, perjury, suborning perjury, pleading fraud that enabled Strauss and Maida to commit extrinsic and extrinsic fraud on an ongoing basis with impunity.

186.    Paragraphs 1 through 185 and 186 hereof of this Complaint are re-alleged and incorporated by reference.

Please take Special Judicial Notice: Again, collusion among, Sacks, Adams, Strauss, and Maida et, al., in this act of fraud in each paragraph has been on-going at different intervals throughout each proceeding within ten (10) years of each other. The evidence demonstrates this act of fraud was before the Trial Court beginning in 1985, and up until 1991, continuing thereafter at the Appellate levels, and reverted back to the Trial Court in 1994 by Court Order, continuing throughout 2003, up until 2005. The Administrative Justice for the Second Judicial District's Order was signed on June 30, 2003 mandating adjudication of this same issue of predicated fraud be adjudicated. The Trial Court again ignored "due process" on this same issue that was taken up to the Appellate Division and Court of Appeals until finalization dated March 23, 2006. In a violation of *"due process"* throughout this protracted action not a single Court Order exists to demonstrate that Complainant's allegations were even addressed or adjudicated within the dictates of existing law within the State of New York or any other jurisdiction.

This particular action is brought concerning the actual acts of fraud! Defendant Strauss **admitted in a taped telephone conversation that the judges wanted Complainant out of his home.** For that reason Strauss took advantage of Complainant knowing he could commit fraud with impunity. Each level of the Court system and each relevant individual State agency was given a copy of this evidence and did nothing to address Complainant's allegations.
At no time did defendant Strauss deny, or attempt to have the Court strike, any evidence from the record, or additional tapes and documents that conclusively proved an *"enterprise"* existed. Instead, Strauss repeatedly continued to perjure himself with confident impunity to defraud Complainant.

Presently an action pursuant to Article III, Section 2, is being perfected which extends the jurisdiction to cases arising under the U.S. Constitution pursuant to Title 42 U.S.C. 1983, for violations of certain protections guaranteed by the Fifth, and Fourteenth Amendment of the Federal Code. Under the *"color of the law"* individuals acting as and in their official capacity associated with the New York State Court system as an *"enterprise"* intentionally, continuously, consistently cooperated to violate Complainant's civil rights. A separate action is being perfected against those involved. The reason for their illegal actions was payback for Complainant's prior "whistle-blowing," concerning $100's of millions of dollars.

These acts of fraud are a continuation of prior acts of fraud
Based upon the "Original Judgment":

187.   As conclusively proven *"beyond any reasonable doubt"* above (*see* Complainant's first Claim for Relief), the original money judgment that defendants Strauss and Maida had procured was procured by fraud. (*As was each money judgment that followed in Claims for relief 2-6*). Complainant will not burden this Court with a detailed history, but will summarize the events associated with this act of fraud.

188.   As proven in the 1st & 2nd Claim for Relief, based upon Justice Louis Merrero's May 5, 1997 Order. Justice Marrero properly denied, on the law, defendants' Strauss and Maida claim to statutory interest based upon the original (fraudulent) money judgment. All levels of the New York Courts failed/refused to address that said judgment in the amount of $571,000.00 plus had been procured by fraud and in violation of *"due process,"* absent "subject-matter jurisdiction" by Order issued by Sacks dated January 31, 1991. Defendants' Strauss and Maida appealed Justice Marrero's Order. Later, Defendant Strauss admitted he and his client had abandoned their appeal, thereby defendants' Maida and Strauss had abrogated any standing they may have had concerning the issue of "statutory interest." Only Complainant had perfected and submitted a timely Cross-appeal of Justice Marrero's Order.

189.   On May 24, 1999, the Appellate Court, refused to address that the original judgment dated January 31, 1991 had been (1) procured by fraud, (2) violated the statutes;   (3) that defendant Strauss had admitted that he and his client had abandoned the appeal, and had thereafter defendant Strauss perjured himself claiming they had not abandoned the appeal. To make defendants' appeal appear timely, someone at the Courthouse intentionally reversed the parties' captions. Even the brief illegally accepted was untimely and violated the rules of the Court, since defendant Strauss had failed to submit a motion for an enlargement of time. The Court ignored that the Clerk's office (proven by a taped telephone conversation that acknowledged that defendants Strauss and Maida had abandoned their appeal and had filed no papers, and no papers would be accepted without a signed Court order, see transcript of the taped telephone conversation accepted as evidence by the Appellate Court Exhibit 366-370, and taped telephone conversation dated March 10, 1998. The Court recklessly and intentionally ignored that the original fraudulent judgment had never been docketed, (no interest could accrue by law, until docketing). **Lastly and most importantly, the issue of interest had been previously before the same Appellate Court 5 years, earlier at which time defendant strauus failed to**

[69]

**obtain relief. His remedy and the matter was *res judicata*! *See* Order dated October 20, 1994, Exhibit 372.**

190.    Despite all of the above irregularities, the Appellate Court recklessly, and intentionally, issued an arbitrary and capricious Order dated May 24 1999, *see* Exhibit 373 that awarded unwarranted interest on a fraudulently secured judgment in violation of *"equal protection clause."*

191.    In that same Appellate Court Order the Court itself reversed one of the fraudulent money judgments issued against Complainant in the amount of $25,793.26. That act of fraud had been conclusively proven (*see* "Second Claim for Relief, above). And said money was never returned. The Appellate Court intentionally ignored defendant Strauss's act of blatant theft.

192.    Complainant submitted a motion for re-argument based upon errors made by the Appellate Divisions that denied Complainant of his civil right to *"equal protection."*

193.    On August 25, 1999, that same Appellate Tribunal intentionally ignored all the evidence, statutes, regulations, and prior policy denied Complainant's motion for re-argument, and, with no legal justification, denied Complainant leave to appeal to the Court of Appeals, barring any review of their vindictive and illegal findings. (*See* Exhibit 376). In addition the Court charged Complainant with costs.

193.    Complainant submitted a motion to "Recall and Vacate" the Appellate Tribunal's prior decision and order issued on August 25, 1999, citing error in law and fact, and that the Court had denied Complainant *"due process"* and *"equal protection."*

195.    On October 26, 1999, the Appellate Division issued an Order (Exhibit 377) without reason or legal justification denying Complainant's application and charging him with costs.

196.    Complainant made an application to the Court of Appeals for Permission to Appeal based upon the irrefutable evidence cited concerning this issue and other violations listed above was blatantly denied of *"due process"* and *"equal protection"* repugnant to the Constitution. On December 20, 1999 the Court of Appeals, in violation ignoring the violations of Complainant's civil rights repugnant to the State and Federal Constitution issued an Order, (Exhibit 378) using this meaningless justification:

"...*be the same hereby dismissed upon the ground that such an order does not finally determine the action within the meaning of the constitution;*

197.   To preserve his rights Complainant submitted an application for re-argument based upon violations of his Constitutional civil rights. On February 29, 2000 (Exhibit 379) Permission to Appeal was again denied based upon the same meaningless statement listed above void any legal explanation.

Trial Court, Justice Kathryn M. Smith
The same May 24, 1999 illegal Order
Denial of Due Process:

198.   A review of the May 24, 1999, Order, page 3 (Exhibit 375) remanded their Order to the lower Court (Supreme Court, Richmond County) for computation of the monies due, the parties.

199.   The Supreme Court assigned the remand to Justice Kathryn M. Smith. On July 7, 2000, defendant Strauss submitted a 17-page Affirmation, most of which was  a distorted and evasive "Chronology of Events," blatantly misquoting Justice Marrero.* Throughout these protracted litigations defendant Strauss repeatedly perjured himself, claiming Complainant's *"undertaking"* was "conditional," and he requested a Money Judgment in the amount of $82,279.72 in accordance with the Appellate Division's May 24, 1999 Order (Exhibit 373-5).

*Again, Strauss, with impunity, committed pleading fraud. On page 14, of his papers he falsely claimed Justice Marrerro directed the Commissioner of Finance to pay Barbara Maida the sum of $25,793.00, all that had been left of the undertaking originally deposited by Complainant (*See,* Second Claim for Relief, above).

200.   Complainant submitted his Opposition, dated July 22, 2000. In pertinent part Complainant proved that interest monies requested had been fraudulently derived and defendant's Strauss's perjury and pleading fraud. Complainant requested the Court immediately to return the matter to the Court of origination, or the Appellate Court.

201.   Hearing was scheduled for July 31, 2000. Complainant appeared with a host of witnesses at the Courthouse. Complainant and Strauss were told to come into a private office. At which time a clerk took our papers, and  told us we would be notified.

202.   On December 1, 2000, Justice Kathryn M. Smith, Supreme Court, Richmond County, issued an Order (Exhibit 380) In a clear violation of *"due process"* Complainant was denied a: (1) hearing, (2) Courtroom, (3) judge, and  (4) Court stenographer. Not a single allegation presented by Complainant was addressed or ruled upon. The Order issued said:

> *"Plaintiff's wife, by order to show cause, moves 1) for a money judgment against defendant husband in the amount of $82,789.72 in accordance with the decision  and order of the Appellate division, 2nd Department rendered May 24, 1999,   together with interest from May 22, 1995; and also moves 2) for the granting of  such other and further relief as may be just and proper in the circumstances.*
>
> *The plaintiff's wife's motion is granted to the extent as previously decided by the appellate division, accordingly, the parties are ordered to settle judgment on notice based on the opinion of the 2nd Department*
>
> *This constitutes the decision and order of the court."*

<u>Note</u>: As has been the pattern of activity from 1986 and throughout Complainant's protracted proceedings ending on March 23, 2006, not a single justice has addressed the repeated and proven allegations of fraud. Nor has any court of decisions addressed the repeated violations of *"due process"* or *"equal protection,"* contained in Complainant's papers.

Strauss sent a formal letter to the Court, asking the Court to provide him with a copy of the *"docketed judgment" see* Exhibit 384.

203.   To accumulate additional unwarranted interest, a year and four months later, on April 12, 2001, Strauss submitted a Money Judgment for $126,175.50 to Justice Kathryn M. Smith for her signature. Justice Smith signed this Money Judgment on <u>April 28, 2001</u>, *see* Exhibit 381-383.

204.   On March 22, 2002, defendants' Strauss and Maida submitted a show cause order to Justice Jeffrey Sunshine requesting a Court Order to have Complainant's home sold by the Sherriff to satisfy their fraudulent money judgment in the amount of $126,175.50 plus costs based upon the arbitrary and capricious Appellate Court Order dated May 24, 1999.

205.   On April 18, 2002 Complainant submitted a two-pronged Opposition and Cross-motion before Justice Jeffrey Sunshine that maintained the statutory interest awarded had been predicated on a fraudulent money judgment for $571,000.00 in the first instance.

206.    On the strength of Complainant's affidavit, exhibits and testimony Justice Sunshine allowed defendant Strauss one week to respond to the charges. Defendant Strauss on the record said:

> "*If I have to respond to the package I will...*"

207.    Justice Sunshine, over Strauss's objections, ordered Strauss to reply to the allegations of fraud and gave Complainant a week to reply, saying on the record, he (Strauss) was to respond "*whether he liked it or not*!" Justice Sunshine set the return date for May 2, 2002.

Illegal Judge Switching:

208.    Inexplicable, in a fashion that should raise suspicion in any reasonable mind, and out of the norm, on the same day, April 18 2002, Justice Sunshine ordered defendant Strauss to reply to complainant's charges of fraud, a *sua sponte* Order was immediately issued (Exhibit 385) transferring this matter from Justice Sunshine to the Hon. Louis Sangiorgio at the behest of Justice Rienzi. On the morning of the hearing, the matter was transferred to Justice Philip Minardo.

**Note, Judge Switching: Whenever has Complainant appeared before a Justice who mandated defendant Strauss to respond to the allegations of fraud that Justice has been is immediately removed. At this time the Chief Justice in New York State formed a Blue Ribbon Panel to investigate "Judge Switching." Complainant requested permission to appear before said panel and was repeatedly denied! Certified Copies of letters to the Chief Justice are available, and Complainant reserves the right to submit to support this allegation.**

209.    On the return date, May 2, 2002, on the matter of the "*Homestead Order*" to sell Complainant's house, Complainant appeared in Justice Minardo's "*Star Chamber*." Like his counterparts, Justice Minardo attempted to have the hearing void a court stenographer. Knowing Minardo's background for questionable Courtroom behavior, Complainant demanded a Court stenographer before he would proceed. On that request, Minardo said he would first have to clear the calendar. When the Courtroom was finally empty, at the end of the day, a sham hearing took place.

210.    In short, on the record, Complainant conclusively proved Strauss had failed to reply to a single allegation of fraud in the amount of $571,000.00. During oral argument, Complainant

[73]

requested the Court question Strauss on each allegation of fraud, Justice Minardo's reply (Exhibit 390, page 5, lines 6-7) was:

> ***"Thank you, I will ask him those questions."***

211.  Despite saying he would question Strauss, at the end of Complainant's argument in which the Court gave Complainant two-minutes to reply [*see*, page 20 (Exhibit 405)] the following transpired:

> Complainant *"What is at issue, what is at bar here, Your Honor, Is their fraud or not fraud?*
> The Court:     *That is the question?..."*

212.  On the record Justice Marrero said: "that is the question." But Justice Minardo intentionally failed/refused to address or question defendant Strauss or address the evidence of fraud, ignoring proof presented supported by 59 exhibits, part of Complainant's briefs.

213.  During the hearing a person unknown to Complainant and witnesses present, who was first sitting in the jury box, walked around the Court during hearing. Before Justice Minardo could question Strauss, this person shook his head and draw his index finger across his neck. Immediately Minardo stood up, told Complainant his two minutes were up, and walked out of the Courtroom.

214.  The Court failed to address or question Strauss concerning a single act of fraud though fraud had been conclusively proven by irrefutable documentary evidence.

215.  On May 6, 2002, Justice Minardo issued an arbitrary and capricious Order (Exhibit 408-9) that ordered the immediate sale of Complainant's home by the Sherriff though other property was available that would have had less damaging economic and personal affect on Complainant.

> *"...ordered that the petitioner's motion for an order directing the Sheriff to sell the real property located at 50 West Entry Road (a/k/a 161 Flagg Place), Staten Island, New York is granted."*

216.  Not only did Justice Minardo ignore the proven acts of fraud, the only papers upon which he ruled (*see*, Order 408) were Strauss's. The Court only listed Complainant's Show Cause Order for a Stay. Previously Justice Sunshine had ordered Strauss, on the record, to reply to the fraud and other violations committed by defendants Strauss and Maida. The failure of the Court

to address the questions of law that Justice Sunshine had Ordered be addressed blatantly violated Complainant's civil right to *"equal protection"* and *"due process."*

217.    On May 22, 2002, Complainant petitioned the Appellate Division, Second Department, for a Stay to halt the illegal sale of his home pending the appeal and an *"Evidentiary Hearing,"* which is mandated by law concerning any *"taking"* of a property. Complainant's application contained irrefutable proof of fraud and violations of Complainant's civil rights repugnant to the United States Constitution. Complainant's application demonstrated that the Court had overlooked that their previous Orders had violated precedent held by the United States Supreme Court.

218.    No jurist throughout these hearings was willing to address proof that an illegal *"taking"* of Complainant's residence was occurring. The notion of *"due process"* is not an academic abstraction. It is rooted in long tradition of Anglo-American jurisprudence. Due process should safeguard, at least in theory, individuals from confiscation or forced to settle claims through the judicial process. The Supreme Court of this United States had this to say concerning a *"taking,"* see, <u>Brodie v. Connecticut</u>, *S.Ct.* 780, 401 U.S. 371.

> *"That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid government interest is at stake that justifies postponing the hearing until after the event."*

219.    On June 19, 2002, with no explanation, the Appellate Court denied the application (Exhibit 410) in violation of precedent held by the Supreme Court of this United States *See,* <u>Goldberg v Kelly</u>, 397 U.S. 245, 271, 299.

230.    On July 11, 2002 Complainant submitted another application before the Appellate Division, again proving *"beyond any reasonable doubt"* that defendant Strauss and Maida had committed fraud and perjury, and that the Courts below had violated Complainant's civil right to *"equal protection."* On August 8, 2002, the Appellate Division issued an order (Exhibit 411) denied Complainant's application charging Complainant with costs, void any explanation or evidence upon what their decision had been based upon.

231.   On September 5, 2002, Complainant submitted an application to "Recall and Vacate" again proving "*beyond any reasonable doubt*" that the Court had overlooked perjury and fraud, and that alternative property could have been sold to satisfy the fraudulent judgment. Complainant conclusively proved defendant Strauss's affirmation had failed to address a single allegation of fraud. Complainant proved defendant Strauss had perjured himself to deceive the Court. By law, the Trial Court and Appellate Court were required to address the proven fraud, supported by the "*relevant evidence*" presented by Complainant. Federal Evidence Rule 401 is clear:

> "*Evidence having a tendency to make the existence of any fact that is consequent to the determination of the action more probable or less probable than it would be without the evidence.*"

232.   On September 26, 2002, with no legal justification the Appellate Division arbitrarily, capriciously, and vindictively denied Complainant's application. Nor did the Court explain the reason for its decision and Order, see (Exhibit 412) or upon what evidence it had relied, thereby violating precedent as did the three prior decisions and orders, held by the Supreme Court of this United States. *See Goldberg v. Kelly*, 397 U.S. 245, 271, 299, held:

> "...*that for a full and fair hearing to have occurred, the courts must demonstrate compliance with elementary legal rules of evidence, and must "state reasons for their determination" and, the courts must indicate what evidence was relied on*

233.   Complainant submitted an application to the Court of Appeals requesting permission to appeal based upon the denial of Complainant's civil right to "*due process*" and "*equal protection.*"

234.   Once again, Complainant conclusively proved that the actions of the lower Courts were repugnant to the Constitution of New York State and the United States Constitution, based upon the following:

(1) that the lower Courts had ignored that the monies awarded as statutory interest had been derived by an intentional act of fraud, which the Courts had refused to address;

(2) that the statutory interest was, by law, unwarranted as established by law, and to award any interest violated the C.P.L.R.;

(3) that defendants Strauss and Maida had admittedly abandoned their appeal that would have allowed for statutory interest;

(4) that defendants Strauss and Maida had committed pleading fraud; and,

seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

### TENTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

#### Statement of Fact

<u>Tenth Claim Fraud</u>:
($15,000.00 plus)

238.    Paragraphs 1 through 237 and 238 hereof of this Complaint are re-alleged and incorporated by reference.

239.    Defendants Strauss and Maida participated in the assertion of materially false and misleading statements of fact set forth above and below and negligently omitted to state material facts necessary in order to make true their statements made in light of the circumstances under which they were made in relationship to (1) breach of contract; (2) Maida's financial status; (3) the lack of participation of defendant Maida in the cost of Complainant's home, proved also to be perjurious.

<u>Note</u>: Defendant Strauss was caught by the Court and Complainant's attorney attempting to collect on the same income executions. Also discovered was that defendant Strauss had collected unwarranted interest on income executions, and twice attempting to collect on the same income executions.

240.    As a direct and proximate result Strauss's and Maida's participation in the assertion of materially false and misleading statements of fact set forth in greater detail above, and their negligently omission to state material facts necessary in order to make true their statements Complainant has been severely injured in business and property. The amount sustained monetary damages still to be computed. Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

### ELEVENTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

<u>Eleventh Claim Fraud</u>:
($75,447.16)

241.   Paragraphs 1 through 240 and 241 hereof of this Complaint are re-alleged and incorporated by reference.

242.   Following the removal of the Hon. Louis Sangiorgio, entered Justice Norman Felig who acted in concert with defendants Sacks and Maida immediately violated Complainant's civil rights to *"due process"* by denying Complainant; (1) an open Courtroom, (2) a Court stenographer, (3) mischaracterizing hearings as conferences, refusing to allow Complainant to be present during motion practices, to name a few violations. Complainant will not burden the Court concerning each violation other than to point to Exhibits 420-449 containing letters, copies of taped telephone conversations, and affidavits that proves *'beyond any reasonable doubt"* that a conspiracy existed and defendants Maida, Strauss et.al.,   took advantage of the situation to defraud Complainant. [Other transcripts of taped-telephone conversations are available if needed.]

243.   In concert with defendants' named above, with no justification defendant Felig repeatedly ordered legal and expert fees void any documented support as required by law. He Ordered Complainant to pay child support, though knowing Complainant's daughter was at all times residing with Complainant and that this fact had been acknowledged on the record by Strauss and Felig.

<u>Please Take Special Judicial Notice</u>: See, Exhibit 420-449 as proof of conspiracy, Memos and letters confirming how Felig recklessly and intentionally denied Complainant *"due process"* and *"equal protection,"* intentionally ignored "law of the case" established by the Appellate Division," blatantly stated that, as far as he was concerned, no separation agreement existed nor would he acknowledge the *"law of the case,"* even though it had been established by the Appellate Division dated October 14, 1986, and from which no appeal was taken. Justice Felig will be a named party in a separate suit for violation of arising under the U.S. Constitution pursuant to Title 42 U.S.C. 1983, for violations of certain protections guaranteed by the Fifth, and Fourteenth Amendments of the Federal Code. Under the *"color of the law"* as individuals and in their official capacity, Defendants associated with the New York State Court system an *"enterprise"* intentionally violated Complainant's civil rights.

244.   As a result of the tortuous conduct of defendant Strauss described throughout this complaint, and defendants' Strauss and Maida's misrepresentations to and concealment of

[79]

material facts from the Court, and their participation in the assertion of the materially false and misleading statements set forth in greater detail above and below, among others, and their negligent failure to state material facts necessary in order to make true their the statements made in light of the statements of the circumstances under, which they were made, Complainant was severely damaged in his business and property.

245.    The negligence of defendants, as alleged herein, was the direct and proximate cause of substantial monetary damage to Complainant in legal fees, expert fees.

246.    With the collusion of defendant Felig, defendants Strauss and Maida were able to secure Court Orders resulting in money judgments for unwarranted child support, unwarranted legal and expert fees in the amounts of: (1) $1,298.08 - 2/11/87  Maida; (2) $1,837.35 - 11/23/88 Maida; (3) $9,369.40 - 7/13/89 Monasch Moss & Strauss Pd, 12/18/89; and, (4) $2,944.33 - 12/18/89 Monasch Moss & Strauss Pd 12/18/89. *See* Money judgments (Exhibit 450-458).

247.    Defendant Strauss intentionally failed to docket a single money judgment awarded by Felig, holding them up for over a year in order to collect interest at the statutory rate in the thousands of dollars. The legal problem with his action was that Strauss illegally collected interest on each money judgment in violation of the statute. interest begins to accrue from the date of docketing, not before!

248.    After almost two full years of judicial abuse, Justice Felig was removed by the Administrative Justice, but, prior to his removal, Felig assigned Judicial Hearing Officer, Lester Sacks without written consent from Complainant or the Administrative Justice. Secondly, he did so in violation of CPLR, in which the statute states the matter is to be adjudicated in 30-days or returned for immediate trial, which never happened! J.H.O. Lester Sacks protracted the hearings over a period of 4-years and even then the matter was not finalized.

249.    As a direct and proximate result of defendants' foregoing conduct, activities and conduct in violation of Sec.1962 (a) and (b) of RICO, Complainant has been severely injured in business and property and was made to expand no less than $30,000.00 in unnecessary legal fees. The

amount sustained monetary damages in the amount of $45,447.16. Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

### TWELFTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Constructive Fraud*

#### Statement of Fact

Twelfth Claim Fraud:
($24,809.26 plus to be computed)

250.   Complaint, while a partner and managing director of Bear Stearns and Company Inc., was a party to a litigation proceeding against Jardine and Company, involving Bear Stearns stock. Complainant obtained his interest in said stock year prior to the parties' "separation agreement" and commencement of his divorce proceedings. Said settlement from said litigation, by law, should not have been part of the equable distribution.  Defendant's Maida and Strauss committed misrepresentations to and concealed material facts from the courts and thus have committed and/or aided and abetted in commission of constructive fraud.

251.   Paragraphs 1 through 250 and 251 hereof of this Complaint are re-alleged and incorporated by reference.

252.   Due to the fraudulent tactics of the *"enterprise,"* defendant Maida received checks for $22,444.00 in November of 1991 and $2,365.26 on January 8, 1992 from a Bear Stearns litigation against Jardine Corporation, which took place following a breach of contract. Defendant's Maida and Strauss committed perjury and the suborning perjury concerning the *"separation agreement"* related to true ownership of the Bear Stearns common stock.

253.   As a direct and proximate result of defendants' foregoing activities and conduct in violation of Sec.1962 (a) and (b) of RICO, Complainant has been injured in business and property. Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

## THIRTEENTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Negligent Misrepresentation / Fraud and Deceit / Constructive Fraud*

### Statement of Fact

Thirteenth Claim for Relief:
($100,000.00 plus)

254.   Due to fraud, perjury, and the suborning of perjury on what should have been, by law, a conversion divorce established by a legal and valid *"separation agreement,"* admittedly dictated by defendant Maida, acknowledged and testified to in Court on the record, who, on the advice of counsel, [defendant Jeffrey T. Straus, Esq., acting in concert with others, committed tortuous conduct described above, the defendants have committed misrepresentations to, and concealed material facts from, the courts and thus have committed, and/or aided and abetted, constructive fraud. As a result, Complainant was forced to retain unnecessary legal counsels [Bruce G. Behrins, John G. Gussow, Sidney Siller, Ann L. Detiere, Roger McCummin, and James O. Guy] to protect his assets from being stolen by defendants under the *"color of law."*

255.   Paragraphs 1 through 254 and 255 hereof of this Complaint are re-alleged and incorporated by reference.

256.   As a direct and proximate result of defendants' foregoing activities and conduct in violation of Sec.1962 (a) and (b) of RICO, Complainant has been injured in business and property. Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees'

## FOURTEENTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Fraud and Deceit / Constructive Fraud*

### Statement of Fact

Fourteenth Claim Fraud:
(Approx. $18,000.00 plus)

257.   Defendant Strauss had issued two income executions in a procedurally infirm turnover proceeding heard before Supreme Court Justice Kramer, presiding. At all times defendant

[82]

Strauss failed legally to notify the parties involved. At the hearing, in a denial of procedural "*due process*," Justice Kramer refused to allow Complainant oral argument, and ruled in Defendant Strauss's favor. Defendant Strauss received monies in the approximate amount of $3,800.00 from Staten Island Savings bank, formerly known as Gateway State Bank, Account No. 1-512935, and approximately $15,000.00 from the Dime Savings Bank. At no time did defendant Strauss apply these monies to any of the outstanding fraudulent judgments. Defendants Strauss and Maida had been able to attain through their constructive fraud. To date Strauss has refused to explain to what these monies were applied or who received these monies he, (defendant Strauss or Maida).

258.    Paragraphs 1 through 257 and 258 hereof of this Complaint are re-alleged and incorporated by reference.

259.    As a direct and proximate result of defendants' foregoing activities and conduct in violation of Sec.1962 (a) and (b) of RICO, Complainant has been severely injured in business and property. The amount sustained monetary damages in the amount of $240,000.00 *see*, (Exhibit 74). Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

FIFTEENTH CLAIM FOR RELIEF
(Claim for Violation of 1962(b) and (d) of RICO)
*Fraud and Deceit / Constructive Fraud*

Statement of Fact

260.    At all times defendants Maida and Strauss have been guilty of outright theft and have been in contempt of Court. Based upon the decision of the Judicial Hearing Officer, Lester Sacks, dated September 14, 1990 (Exhibit 21-27) defendant Maida was to turn over to Complainant 50% of art in antique furniture,* and 50% and a doll collection valued at no less than $140,000.00 to $160,000.00 in 1985. On advice of counsel, (Strauss) defendant Maida ignored the Court's Order. Complainant was before the Hon. Jeffrey Sunshine, who ordered Strauss to address Complainant's motion concerning fraud and monies due Complainant

[83]

concerning the furniture, art, and doll collection and rents collected on the joint residence, (additional monies were collected up and until 2008). At all times defendants Maida and Strauss refused to address the allegations or turn over the property or value at said time. As stated above the matter was transferred to Justice Philip Minardo who intentionally and recklessly ignored Complainant's pleading and allegations. This issue is still outstanding.

*Note: Also discovered and proven at Trial was that defendant Maida had illegally disposed of the parties joint marital antiques and had illegally sold securities in her personal stock account during the pendency of the litigation and had to be ordered by the Court at trial to cease and desist.

Fifteenth Claim Fraud:
($75,000 plus, at 1985 values)

261.   Paragraphs 1 through 260 and 261 hereof of this Complaint are re-alleged and incorporated by reference.

262.   As a result the fraud listed in this claim, Complainant sustained monetary damages in the amount of $75,000.00 at the 1985 valuation, exclusive of appreciation  Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

## SIXTEENTH CLAIM FOR RELIEF

### (Claim for Violation of 1962(b) and (d) of RICO)
*Fraud and Deceit / Constructive Fraud*

Sixteenth Claim Fraud:
($750,000.00 plus)                    Statement of Fact

263   If the laws for the State of New York had been enforced, Complainant would still be possession of his home at 50 West Entry Road, Staten Island. Instead, Complainant was forced to repeatedly mortgage his home, and finally sell it to satisfy the fraud committed by  defendants Maida and Strauss.

264.    If co-conspirators, defendants J.H.O. Sacks and Acting Justice Adams had not denied Complainant "due process" and *"equal protection,"* acting in concert with defendants Maida and Strauss under the "color of the law" as part of an *"enterprise"* ignoring statutes, prior public policy, regulations, and precedent Complainant would never have suffered the loss of his home.

265.    Paragraphs 1 through 264 and 265 hereof of this Complaint are re-alleged and incorporated by reference.

266.    The amount sustained monetary damages to Complainant is, at the minimum, $750,000.00 at the 1985 valuation, exclusive of appreciation Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action,

### SEVENTEENTH CLAIM FOR RELIEF

(Claim for Violation of 1962(b) and (d) of RICO)
*Fraud and Deceit / Constructive Fraud*

Seventeenth Claim Fraud:
($4,000,000.00 plus, still to be computed)

### Statement of Fact

267.    Due to the fraud perpetrated by defendants Sacks, Strauss and Maida outline in Complainant's "first claim for relief" Complainant was unnecessarily forced to sell 43,500 shares of Bear Stearns *"common stock"* on March 18, 1991 to raise the monies need to satisfy a fraudulent money judgment in the amount of $571,556.66, see tax accountant letter dated October 8, 1991, Exhibit 459. Due to defendant Strauss's letter and (Exhibit 460) premature restraining Order see Exhibit 461-4. Thereby Complainant was deprived of stock dividends on said stock from 1991 to present.

Note: Judical Hearing Officer Lester Sacks's, judgment issued in absence of "*subject-matter jurisdiction*, see transfer notification Exhibit 465, that deprived Complainant of dividends from 1991 up until the present.

268.    Total loss of the shares of common stock amount to 75,233, plus a 5% stock dividend issued 2/10/99 that amounts to an additional 3,762 shares. The loss in actual dollars associated with said stock is still to be computed, and will exceed no less than $3,949,732.00 at a

conservative estimate of $50.00 per share. This stock reach in excess of $175.00 per share. The Court will have to make a judgment what would be the proper value assigned to the stock.

269.   As a result the fraud listed in this claim, Complainant sustained monetary damages in the amount of $4,000,000.00 exclusive of appreciation  Under the provision of 1964 (c) of RICO, Complainant seeks to recover herein treble damages and the cost of bring this action, including reasonable attorneys' fees.

## IN CONCLUSION

270.   By law, the governing principle in law, in a Court of Equity, is that whenever a party who, as an actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, the doors of the court will be shut against him in *limine;* the Court will refuse to interfere on his behalf, to acknowledge his right, or award his/her remedy. *See,* Pomeroy, Equity Jurisprudence (4th ED.) sec. 397. It is a principle in chancery, that he who asks for relief must have acted in good faith. The Courts Complainant was before intentionally ignored these set principles. The Supreme Court has said, *See Bein v. Heath,* 228,247, 12L.Ed. 416:

> "*the equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or through deceit or unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of inequity.*"

271.   The Supreme Court of this United States held in *Deweese v. Reinhard,* 165 U.S. 386, 390, 17 S. Ct. 340, 341, 41 L.Ed.757:

> "*A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to dictate of natural justice, then, whatever     may be the rights he possesses, and whatever use he may make of them in a court  of law, he will be held remediless in a court of equity.*"

Please Take Special Judicial Notice: At no time on or between 1986 and 2006 during which this protracted litigation took place, did any Court for the State of New York address a single predicated act of fraud listed above and below. Nor was any Order issued any of the three levels of the State  Court pertaining to these predicated acts of fraud find any substantial support in the record! Nor can a single State Court articulate or cite a basis in law for any of their prior decisions. Nor can a single Court refer to, or point to, any evidence relied upon in support of their findings, in clear violation of Section 1983, 42 U.S.C. 1983. Nor can any Court in the State of New York explain the reason for the Court's denial of Complainant's "due process" and

'equal protection" rights following an Order dated June 30, 2003 that mandated review and adjudication concerning each act of fraud presented above and below.

272.    On March 23, 2006 the Court of Appeals denied Complainant Permission to Appeal on Re-argument Motion Nos. 1202, 1033 & 505. This denial violated Complainant's civil right to *"due process"* and said in pertinent part:

> *"ORDERED, that the said motion be and the same hereby is denied"*

273.    The above decision was based upon a prior Order of the State's highest Court, the Court of Appeals, Order dated December 20, 2005 (Exhibit 378) that blatantly violated Complainant's right to *"due process"* and *"equal protection."* At bar is/was the repeated unconstitutional decision and Order of the Appellate Division, Second Department, dated August 22, 2005, on which Complainant's re-argument was predicated. Related to this Order, the State's highest Court, with no legal justification, repeatedly issued the same incoherent finding using in pertinent part the meaningless statement:

> *"ORDERED, that the said motion for leave to appeal be and the same hereby is dismissed upon the ground that the order sought to be appealed from does not finally determine the action within the meaning of the Constitution;..."*

274.    Complainant at all times presented timely motions and applications to protect his property. The denial of Complainant's civil rights will be addressed in a separate suit as stated above pursuant to Title 42 U.S.C. 1983, for violations of certain protections guaranteed by the Fifth, and Fourteenth Amendments of the Federal Code. Under the *"color of the law"* as individuals and in their official capacity, defendants associated with the New York State Court system an *"enterprise"* intentionally violated Complainant's civil rights because of Complainant's prior whistle-blowing.

275.    The tortuous actions of the defendants named herein concerning the fraud listed above was a result of the *"enterprise's"* knowledge of the bias of the Courts who, therefore, took advantage of the situation to damage Complainant.

Note: At all times defendants used the mails, forwarding correspondence to Complainant, Complainants attorneys, and too each level of the New York State Court system as did the Court system to accomplish the numerous acts of fraud by depositing said perjurious communications

[87]

in the hands of the U.S. Postal Service, and did so, fax transmissions, numerous other correspondence that are available upon request.

### PRAYER FOR RELIEF

WHEREFORE, Complainant seeks judgment, jointly and severally, against all defendants as follows:

1)      Declaring the First through Seventeenth Claims for Relief pursuant to Rule 23 of the Federal Rules of Civil procedure be granted;

2)      For treble damages pursuant to 1964 (c) of RICO;

3)      For punitive damages on the first through the seventeenth Claim for Relief;

4)      For costs of bringing this action, including reasonable attorneys' fees and expert witness fees;

5)      The reversal of all judgments related to monies issued by New York State Court's pursuant to the clean hands doctrine;

6)      Awarding pre-judgment and post-judgment interest on all amounts awarded to the fullest extent permitted by law or in equity; and

7)      Granting such other and further relief as may be just and proper.


DATE: June 16, 2008

NICHOLAS E. PURPURA
/Pro se
1802 Rue De La Port Dr.
Wall, New Jersey 07719
Telephone: 732-449-0856

Sworn to before me this
16 day of June, 2008

Joseph F. DeFino
An Attorney at Law of
the State of NJ

## DEMAND FOR JURY

Complainant pursuant to Rule 38(b) of this Federal Rules of Civil Procedure hereby demands a trial by jury.

DATE: June /6, 2008

NICHOLAS E. PURPURA
*Pro se*
1802 Rue De La Port Dr.
Wall, New Jersey 07719
Telephone: 732-449-0856
Cell       718-974-2273

---

## VERIFICATION

I, NICHOLAS E. PURPURA, hereby declare as follows:

I am acting *pro se* in this action. I have read the foregoing Complainant and know the contents thereof. With respect to the claims contained therein, I am informed and believe that such matters stated and alleged therein are true and on that ground allege that such matters stated and alleged therein are true.

Executed this /6 day of June, 2008

NICHOLAS E. PURPURA